# United States Court of Appeals
## For the First Circuit

———————————

Nos. 01-2272, 01-2524

MOUNA KANDY SUBOH, INDIVIDUALLY, AS ADMINISTRATIX OF THE ESTATE
OF ISHAQ SUBOH, AND AS NEXT FRIEND OF HER MINOR DAUGHTER SOFIA
KANDY,

Plaintiff, Appellee,

v.

DISTRICT ATTORNEY'S OFFICE OF THE SUFFOLK DISTRICT, MICHAEL N.
MURPHY, CARL BORGIOLI,

Defendants, Appellants,

CITY OF REVERE, MASSACHUSETTS; ROBERT J. HAAS JR.; JAMES RUSSO;
STEVEN PISANO; JOHN MCRAE; STEVEN WALLACE; THEODORE MICHALSKI;
JULIEANN MAVAROSA; ANTONIO ARCOS; JOHN M. AZZARI; RICHARD
BACHOUR; RALPH C. MARTIN II; INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITIES,

Defendants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

———————————

Before

Selya and Lynch, Circuit Judges,
and Schwarzer,[*] Senior District Judge.

———————————

Linda A. Wagner, Assistant Attorney General, with whom Thomas
F. Reilly, Attorney General, was on the brief for appellants
District Attorney's Office and Michael N. Murphy.

———————————

[*] Of the Northern District of California, sitting by
designation.

Michael J. Akerson with whom Austin M. Joyce and Edward P. Reardon, P.C. were on the brief for appellant Carl Borgioli.

Harvey A. Schwartz with whom Kimberly H. Scheckner, Rodgers, Powers & Schwartz, James R. Knudsen, and Wittenberg & Associates were on the brief for appellee.

_____

August 1, 2002

_____

**LYNCH**, **Circuit Judge**.  This appeal presents issues of qualified immunity for public officers, beneath which lie significant issues about parents' rights under the United States Constitution.  The case history is one of international intrigue and of local law enforcement officers attempting to respond to the requirements of both criminal law and family law.  Of the two defendants before us on appeal, we hold that one, Assistant District Attorney Michael Murphy, is entitled to qualified immunity.  The other, Revere Police Officer Carl Borgioli, is not so entitled at the summary judgment stage.  Consequently, we reverse the district court's denial of summary judgment on this issue as to Murphy and affirm the denial as to Borgioli.

I.

We give the general background and then focus on what was known to the two defendants.  We describe the facts in favor of the nonmoving party on summary judgment.

This case arises out of a complicated family dispute, involving three generations and three continents.  The end result, according to the plaintiff, is that she has been deprived of custody of her young daughter due to the actions of the defendants.

The plaintiff, Mouna Kandy Suboh, is a native of Morocco and is now a resident of Massachusetts.  In 1991, while still living with her parents in Morocco, she became pregnant out of wedlock.  Suboh then fled to Holland to avoid what she says was her father's rage at her pregnancy.  A daughter, Sofia, was born in Holland on April 9, 1992.  Shortly thereafter, Suboh's mother

-3-

traveled to Holland and convinced her to return to Morocco with the baby. Suboh's parents, the Kandys, then raised Sofia as if she were their own child. At some point, Suboh says, the Kandys obtained a fake birth certificate purporting to certify that Sofia was their biological child. At no point did they ever legally adopt Sofia; according to the plaintiff, Moroccan law does not allow such adoptions and Morocco officially recognizes Suboh as Sofia's mother. Suboh claims that her father is physically abusive and controlling, and that she agreed to her parents pretending to be Sofia's parents only because she feared her parents would not let her see Sofia at all if she did not agree.

In 1995, Suboh met an American citizen, Ishaq Suboh, and moved to Massachusetts to marry him. She says that the Kandys had promised to send Sofia to live with her in the United States, but reneged on that promise once she had left Morocco. Suboh says she returned to Morocco four times, attempting to obtain custody. She also filed a case in the Moroccan court system, but she says that the case was never adjudicated, due to her father's power and influence in Morocco. She eventually dropped the legal case so that her father would allow her to see Sofia again.

In April 1998, the Kandys came to Massachusetts in order for Suboh's father to receive medical treatment. They brought Sofia with them and stayed with Suboh and her husband at their apartment in Revere. On May 26, 1998, Suboh and her husband quarreled with the Kandys about whether Sofia would be returning to Morocco with the Kandys or staying with Suboh in Massachusetts.

-4-

Following that fight, Suboh's husband called the Boston city councillor's office to explain the situation. An official there advised the pair to keep Sofia with them. Suboh and her husband then packed up their things, took Sofia, and went to the city councillor's office. They took with them Sofia's Dutch birth certificate, Moroccan birth identification records showing that Suboh was Sofia's mother, a document from the Dutch hospital where Sofia was born, papers from Suboh's Moroccan attorney, and copies of the Kandys' forged documentation. An official at the city councillor's office told them she would contact an attorney for them, and advised them to stay away from the Kandys and keep Sofia with them in the meantime. Suboh and her husband also went to the Immigration and Naturalization Service office to try to obtain residency papers for Sofia, but were unable to do so because they did not have her passport. Later that day, they checked into a hotel. The following day, after Suboh's husband spoke with Mr. Kandy, the two checked into another hotel.

Mustapha Kandy, Suboh's father, called the Revere police and reported that one of his daughters (Suboh) had kidnapped his other daughter (Sofia). The Kandys told the Revere police that Suboh and Sofia were sisters and that they, the Kandys, were Sofia's parents. The Kandys showed the police a birth certificate in French and Arabic indicating that Sofia was their daughter. This birth certificate was translated by a Revere police officer.

In the early morning of May 28, Officer Borgioli became involved with the case. He reviewed the information that his

colleagues had obtained on the previous day. He went to the Revere apartment to interview the Kandys. The Kandys also showed him Sofia's passport and a document that turned out to be the forged birth certificate. While at the apartment, Borgioli also spoke with the officer who had translated the Kandys' documents. Borgioli also spoke with the Kandy's niece, who was visiting at the time. Borgioli stated in an affidavit that the niece told him that the Kandys had raised Sofia from a very young age.

Borgioli testified at his deposition that Mrs. Kandy told either him or one of the FBI agents that Suboh was Sofia's biological mother and that the Kandys had adopted Sofia. In his police report, Borgioli did not include anything about this supposed adoption, or the fact that the Kandys allegedly told him that Suboh was Sofia's biological mother. His affidavit confirms that he learned that Suboh was the biological mother from Suboh herself, when he interviewed her on the following day at the police station. Borgioli testified that he was under the impression, based on something that an Arabic-speaking FBI agent told him, that the Kandys' documents were adoption papers. But he also testified that he did not recall that either the Kandys or anyone else had ever used the word adoption. And this belief was also inconsistent with the document itself, which refers to Mrs. Kandy as the mother and says nothing about adoption.

Mr. Kandy told Borgioli that their son-in-law, Ishaq Suboh, had come to the apartment at some point earlier that day or on the previous day. Mr. Kandy said that, at that time, Ishaq had

stolen a Rolex watch from him and asked for money, which he gave him. Mr. Kandy said that Ishaq then asked for more money and said he would call back later to arrange for a time for them to meet. Borgioli stated that Mr. Kandy believed that Suboh and her husband were holding Sofia for ransom money. There is nothing in the record, however, about Ishaq Suboh requesting ransom for the return of Sofia and nothing indicating that Mouna Suboh knew of such requests, if any were made.

Officer Borgioli called the District Attorney's office from the apartment. Borgioli spoke with Assistant District Attorney Murphy, telling him that the case involved a kidnapping for ransom and asking him questions about setting up a tap on the apartment's telephone. Murphy did not remember whether Borgioli told him that the Kandys were the biological parents of Sofia, or her custodians, but he says that Borgioli led him to believe that the Kandys had legal custody of Sofia.

While Borgioli was obtaining information from the Kandys, a fellow Revere police officer, who was with him at the Revere apartment, obtained information that Ishaq Suboh had attempted to charge airline tickets to his credit card, which was at its limit. At this point, the FBI was called in to assist with the case.

At some point during the day, Ishaq Suboh called from a number that the police later learned was the Boston City Council. He refused to speak with Mr. Kandy, but spoke with Mrs. Kandy and arranged to meet her at a nearby donut shop. Borgioli says that he understood the purpose of the meeting was to arrange the

circumstances for Sofia's return. A special agent from the FBI listened in on the phone conversation. The meeting never took place.

The following day, two Revere police officers (not including Borgioli) located Suboh in a hotel in Malden. Suboh told the police at that time that Sofia was her daughter and attempted to give them official, certified documentation showing that she was Sofia's birth mother. The police declined to accept the documents at that time.

The police then took Suboh and Sofia to the Revere police station to be interviewed. Borgioli conducted the interview. Suboh told Borgioli that she was Sofia's mother and that the Kandys' documents were false. She says she told him about the fight with her parents regarding whether Sofia would return to Morocco. She says she also told him that she had legal custody of Sofia. She again showed all her documentation from the Netherlands and Morocco. She also repeatedly requested that Borgioli call the Moroccan embassy or the Netherlands embassy to verify her documentation. The police took Suboh's documents and photocopied them, although they made no effort to have them translated or to confirm them with the relevant embassies. Suboh also told Borgioli that her parents' visa was about to expire, and they had tickets to return to Morocco with Sofia. She says she asked the police to keep Sofia in state custody. Suboh says that the police repeatedly asked her about the stolen watch and her husband's alleged demand for money, and that she responded, "Which watch, what money, I

don't know what you're talking about." She says they were only concerned about the money and the watch, and her movements over the previous two days, and not about her claims to be Sofia's mother.

Borgioli testified that Suboh told him she had given up custody of Sofia to the Kandys, or that the Kandys had adopted Sofia without Suboh's consent and that she was trying to "regain" custody. This is contrary to Suboh's testimony, as is Borgioli's statement that Suboh never told him not to release Sofia to the Kandys, or expressed fear that the Kandys would take Sofia to Morocco. Borgioli did admit that Suboh said she had never given her permission for an adoption. He also testified that Suboh had suggested that the Kandys' documents were forged, but said that "it was just speculation on her part" and he thought she was just trying to avoid being arrested. He also recalled her telling him about the difficulties she had trying to regain custody under the Moroccan system. He said that he made no effort to investigate whether Suboh's claims about the various custody documents were true, because he had no reason, other than Suboh's word, to believe her. The same was, of course, true for the Kandys' word.

During the interview, Borgioli again called Assistant District Attorney Murphy. Both Borgioli and Murphy agree that, at this point, Borgioli told Murphy that Suboh was Sofia's biological mother. He asked Murphy, in a case where Suboh was the biological mother but not the legal guardian, whether he should charge her with straight kidnapping, kidnapping by a relative, or kidnapping

by a parent.  He also either asked if he could release Sofia to the Kandys, or stated that he was going to release Sofia to them. Murphy replied that he would have to call back.  When he called back a few minutes later, Murphy told Borgioli that Suboh should be charged with kidnapping by a relative.  Murphy may have also said "okay" in response to Borgioli's statement or question about releasing Sofia to the Kandys, but Murphy did not recall having said that.  There is no evidence in the record that Murphy was given any additional information about the case, such as the fact that Suboh had documentation beyond what the Kandys had presented or the fact that Suboh alleged that the Kandys' documents were forged.  There is no evidence that Murphy was told that legal custody of the child was disputed.  There is also no evidence that Murphy knew, or had reason to believe, that the Kandys' visa was expiring or that they planned to take Sofia back to Morocco immediately.

Suboh says that Borgioli told her that Sofia would be temporarily placed in state custody.  Suboh says that an FBI agent who was present also told her that Sofia would be placed with the state Department of Social Services (DSS), and the police would keep her passport.  She says the agent instructed Borgioli to "keep the passport and the daughter at the DSS."[1]  Borgioli says that he never considered involving the DSS.

---

[1]     There does not appear to have been any discovery from the FBI agents about what they told Suboh or Borgioli.

The police charged Suboh with kidnapping by a relative and transported her to court. Suboh asked if Sofia could come with her, and Borgioli told her that Sofia could not come to court, but that Suboh would see Sofia when she came out of court.

Despite these representations to Suboh and the statement by the FBI agent instructing Borgioli to place the child with DSS, Borgioli then released Sofia to the Kandys. Borgioli did not ask the Kandys not to leave the country, nor did he make any efforts to make sure that they would not leave the country with Sofia. He admits that he never told Suboh that he was going to release Sofia to the Kandys and admits that it is fair to say that the decision to release Sofia to the Kandys was his decision.

Immediately after Sofia was returned to them, the Kandys returned to Morocco with the child. The charges against Suboh and her husband were later dismissed. Suboh has not been able to regain physical custody of her daughter since that time.

## II.

On March 6, 2000, Suboh, the estate of her now-deceased husband, and Sofia (acting through Suboh, her next friend) brought suit in the federal district court of Massachusetts against Borgioli, Murphy, the District Attorney's office, the City of Revere, and various other individuals associated with the case. The case alleged deprivation of the rights of Suboh, her husband, and Sofia, as secured by the Constitution and the laws of the United States, and liability under the Massachusetts Torts Claims Act, Mass. Gen. Laws. ch. 258, § 2 (2000), the Massachusetts Civil

-11-

Rights Act, id. ch. 12 § 11I, and various state law tort claims. For purposes of this appeal, we analyze all of the claims as Suboh's claims.

On August 1, 2000, Murphy filed a motion to dismiss the § 1983 claims brought against him in his individual capacity, asserting immunity and other defenses.[2] Suboh v. City of Revere, 141 F. Supp. 2d 124, 127 (D. Mass. 2001). On March 30, 2001, the district court denied the motion to dismiss, holding that Murphy was not entitled to either absolute prosecutorial immunity or qualified immunity. Id. at 136-45. As for Murphy's claim of absolute prosecutorial immunity, the district court reasoned that because "the deprivation of which [the plaintiffs] complain is wholly unrelated to any prosecutorial functions," there was no prosecutorial immunity. Id. at 137. The district court then concluded that Murphy was not protected by qualified immunity because Suboh's claim "lies at the core" of a clearly established right to familial integrity, id. at 140, and that, as the case was presented by Suboh, "a reasonable person in Murphy's position would have known that his release of Sofia into the Kandys' custody violated that right," id. at 142. As a second ground, it reasoned that Murphy's conduct violated a clearly established "substantive due process right of a parent and her child not to have a child in

_____

[2] The motion to dismiss also encompassed other claims against Murphy and the District Attorney's office. The district court dismissed some claims, and denied the motion as to other claims. Suboh v. City of Revere, 141 F. Supp. 2d 124, 124, 145 (D. Mass. 2001). These other claims are not at issue in this appeal.

state custody turned over to someone whom the state knows, or should know, to be dangerous." Id.

Murphy originally appealed from the district court's decision, but then voluntarily withdrew his appeal without prejudice, after filing a motion for summary judgment with the district court. On September 25, 2001, the district court denied Murphy's motion for summary judgment. The court agreed that it was undisputed that "the whole case was presented to Mr. Murphy [by Borgioli] in a sense favorable to the grandparents." Nonetheless, it found that there was a material fact in dispute as to whether Borgioli asked Murphy for legal advice regarding whether to release Sofia to the Kandys.

On August 17, 2001, Borgioli filed a motion for summary judgment. On September 5, 2001, the district court granted Borgioli's motion with respect to Suboh's Fourth Amendment claims, but left Suboh's Fourteenth Amendment claims standing and denied Borgioli's qualified immunity defense for the reasons articulated in its March 30, 2001, decision regarding Murphy's qualified immunity defense.

The court stayed the trial pending Murphy's and Borgioli's appeals.[3]

---

[3] The district court initially denied Borgioli's motion to stay the trial, ruling that it was untimely because the legal conclusion from which Borgioli sought to appeal was articulated in its March 30, 2001, ruling, from which Borgioli took no appeal. Borgioli petitioned this court, which issued an order clarifying that Borgioli's motion was timely. Following that order, the district court immediately granted the requested stay.

III.

This court has jurisdiction to consider interlocutory appeals from the denial of a defendant's motion to dismiss or for summary judgment on a qualified immunity defense. Behrens v. Pelletier, 516 U.S. 299, 305-07 (1996); Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 6 (1st Cir. 2001). Denials of summary judgment on qualified immunity grounds are reviewed "to the extent that the qualified immunity defense turns upon a 'purely legal' question" and any disputed facts are not material to the issue of immunity. Fletcher v. Town of Clinton, 196 F.3d 41, 45 (1st Cir. 1999) (citations and internal quotation marks omitted). Our standard of review in such cases is de novo. Id. at 48.

We use a three-part test to determine whether an official is entitled to qualified immunity, Hatch v. Dep't of Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001), following the guidance provided by the Supreme Court, see Wilson v. Layne, 526 U.S. 603, 609 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Siegert v. Gilley, 500 U.S. 226, 232 (1991). The threshold inquiry is whether the plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 122 S. Ct. 2508, 2513 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001); Siegert, 500 U.S. at 232. The second question is whether the right was clearly established at the time of the alleged violation. That inquiry is necessary because officers should be on notice that their conduct is unlawful before they are subject to suit. Hope, 122 S. Ct. at 2516-18; Anderson v. Creighton, 483 U.S. 635, 638-40

-14-

(1987).  The third is whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right.  Swain v. Spinney, 117 F.3d 1, 9 (1st Cir. 1997).  The question of whether a right is clearly established is an issue of law for the court to decide.  Elder v. Holloway, 510 U.S. 510, 516 (1994).  The reasonableness inquiry is also a legal determination, although it may entail preliminary factual determinations if there are disputed material facts (which should be left for a jury).  Swain, 117 F.3d at 10.

Borgioli argues that none of the three criteria are met.  Murphy makes the more restrained argument that the second two criteria are not met.  The arguments merge to the extent that they both assert that there is no clear definition of what the district court called a "right to familial integrity."  Suboh, 141 F. Supp. 2d at 139.

A.  Identification of a Constitutional Right

The district court based its ruling on an abstract right to "familial integrity" inherent in the substantive component of the Due Process Clause of the Fourteenth Amendment.  Id.  In doing so, the district court relied on a series of Supreme Court cases ranging from Meyer v. Nebraska, 262 U.S. 390 (1923), to Troxel v. Granville, 530 U.S. 57 (2000).  These cases cover a range of issues, from constraints on a state's power to mandate compulsory public education, Meyer, 262 U.S. 390, to constraints on a state's ability to mandate grandparent visitation rights, Troxel, 530 U.S. 57.

-15-

There is a danger in the use of broad abstract terms such as "familial integrity". The Supreme Court has warned against using generalized definitions of constitutional rights in the qualified immunity setting. Anderson, 483 U.S. at 639. This court, in Frazier v. Bailey, 957 F.2d 920, 929-30 (1st Cir. 1992), held that it is not sufficient for a plaintiff to allege an abstract due process liberty interest in family relationships. The qualified immunity defense requires that the "familial integrity" right asserted be stated with particularity. Id.; see also Hatch, 274 F.3d at 20.

Putting aside notions of generalized "familial integrity," there are, more pertinently, much more narrow interests that are at stake here. To begin, "[t]he interest of parents in the care, custody, and control of their children is among the most venerable of the liberty interests embedded in the Constitution." Hatch, 274 F.3d at 20; see also Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997) (recognizing "the constitutionally protected liberty interests that parents have in the custody, care and management of their children"); Jordan v. Jackson, 15 F.3d 333, 342 (4th Cir. 1994) ("The state's removal of a child from his parents indisputably constitutes an interference with a liberty interest of the parents and thus triggers the procedural protections of the Fourteenth Amendment."); Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990) ("[The plaintiff] clearly does have a protectible liberty interest in the care and custody of his children."); Hooks

-16-

v. Hooks, 771 F.2d 935, 941 (6th Cir. 1985) ("It is well-settled that parents have a liberty interest in the custody of their children.")  The child has a similar liberty interest in being in the care and custody of her parents.  See Brokaw v. Mercer County, 235 F.3d 1000, 1018-19 (7th Cir. 2000); Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977); Opinion of the Justices to the Senate, 427 Mass. 1201, 691 N.E.2d 911, 915 (1998).

This liberty interest is protected both by the substantive component of the Due Process Clause, which constrains governmental interference with certain fundamental rights and liberty interests, and by the procedural component of the Due Process Clause, which guarantees "fair process."  Washington v. Glucksberg, 521 U.S. 702, 720 (1997).  In this case, we focus our analysis primarily on the procedural aspect, which is most directly implicated by the facts presented here.[4]  What is at issue here is the right of a parent to procedural due process protections before a governmental official resolves the disputed issue of custody of a child, when there are known competing claims to custody.

Due process claims more commonly arise in situations where state agency officials remove a child from the custodial parents, usually where there is some suspicion of child abuse or

---

[4]     The district court's holding regarding the "substantive due process right of a parent and her child not to have a child in state custody turned over to someone whom the state knows, or should know, to be dangerous" was in error.  Suboh, 141 F. Supp. 2d at 142.  There is no evidence in the record to establish that the defendants had any reason to think that the Kandys posed a danger to Sofia.

neglect.  In <u>Santosky</u> v. <u>Kramer</u>, 455 U.S. 745 (1982), the Supreme Court held that before a state may sever the parent's rights in their child, due process requires that the state support its allegations of abuse or neglect by at least clear and convincing evidence, <u>id.</u> at 768-71.  In cases where the safety of the child is at risk, there are competing liberty interests, and so the parents' rights are not absolute.  Based on this principle, we have frequently upheld immunity for state actors who investigate child abuse allegations and take emergency action to protect a child. <u>See</u> <u>Hatch</u>, 274 F.3d 12, 20-22, 24-25; <u>DaCosta</u> v. <u>Chabot</u>, 59 F.3d 279 (1st Cir. 1995); <u>Frazier</u>, 957 F.2d at 920, 931.

Generally speaking, the question of what process is due involves a weighing of the different interests of the child, the parents, and the state.  <u>Hatch</u>, 274 F.3d at 20; <u>see</u> <u>also</u> <u>Weller</u>, 901 F.2d at 395-96 (considering interests and facts in case to determine what process was due); <u>Opinion of the Justices</u>, 691 N.E.2d at 915; <u>Care & Prot. of Robert</u>, 408 Mass. 52, 556 N.E.2d 993, 996-97 (1990).  Due process protects a parent's rights even when a state temporarily removes a child before obtaining a court order, as the state may place a child in temporary custody only when it has evidence giving rise to a suspicion that the child has been abused or is in imminent danger.  <u>Hatch</u>, 274 F.3d at 20; <u>see</u> <u>also</u> <u>Wallis</u> v. <u>Spencer</u>, 202 F.3d 1126, 1138 (9th Cir. 2000); <u>Croft</u>, 103 F.3d at 1125.  Moreover, due process requires that some sort of process be provided promptly after an emergency removal.  "'[I]n those "extra-ordinary situations" where deprivation of a protected

interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed.'" Weller, 901 F.2d at 393 (quoting Hooks, 771 F.2d at 942 (quoting Duchesne, 566 F.2d at 826)); see also Brokaw, 235 F.3d at 1021; Campbell v. Burt, 141 F.3d 927, 929 (9th Cir. 1998); Jordan, 15 F.3d at 343. Both the right to predeprivation process and the right to postdeprivation process are at issue in this case.

Suboh's claim is that Officer Borgioli, enabled by Assistant District Attorney Murphy, effectively decided the custody dispute by turning the child over to the Kandys while knowing the Kandys were about to leave the country with the child; thus, he effectively deprived Suboh of her parental right to the care and custody of her child without providing her with due process procedures. In so doing, Borgioli ignored due process procedures established by state law to deal with situations such as this one. These include procedures for the state to take custody of a child whose guardian is unavailable, Mass. Gen. Laws ch. 119, § 23(C) (2000), procedures for the state to take temporary custody of children needing care and protection, id. ch. 119, § 24 (2000), procedures for determining custody of children born out of wedlock, id. ch. 209C, § 10 (2000), and procedures for enforcing foreign custody judgments within Massachusetts, id. ch. 209B, § 12 (2000). Yet Borgioli short-circuited all of these procedures by deciding the issue on his own.

-19-

Generally, "there is a presumption that fit parents act in the best interests of their children." Troxel, 530 U.S. at 68. Here, there was no suspicion of child abuse or reason to suspect that the child would be in imminent peril, and thus no reason to sever Suboh's parental rights prior to the state's resolution of the custody dispute through its normal procedures. See Hatch, 274 F.3d at 20. One of Suboh's rights as a mother was the right to choose a proxy custodian for Sofia following her arrest. See In re Dep't of Pub. Welfare, 383 Mass. 573, 421 N.E.2d 28, 34 (1981) (noting, in case of incarcerated mother, that mother's "presumptive right to custody of the child includ[es] the right to choose a caretaker proxy"). Borgioli's actions deprived her of this right.

Moreover, there was evidence both that Suboh told Borgioli that the Kandys were planning on leaving the jurisdiction with Sofia within days and that Borgioli knew the Kandys' visa was about to expire and that they had return tickets to Morocco. Borgioli therefore had reason to know that Suboh would never receive any postdeprivation hearing. See Weller, 901 F.2d at 396 ("[I]t is alleged that in addition to depriving [the parent] of custody without a hearing, defendants arranged for [the child] to be taken out of the jurisdiction . . . thereby reducing the possibility of a post-deprivation hearing."); Hooks, 771 F.2d at 942 ("Here the children were turned over . . . allegedly with the knowledge that they would immediately be taken . . . out of the jurisdiction . . ., effectively eliminating the opportunity for plaintiff to receive a post-deprivation hearing.").

We think it plain that Suboh alleges a violation of a constitutional right.

## B. Clearly established at the time

Both defendants say there was sufficient ambiguity as to the scope of "familial integrity" rights when they acted in 1998 that they are entitled to immunity because the right was not clearly established at the time. This court has held that, at least as of 1992, "the dimensions of this right [to familial integrity] have yet to be clearly established." Frazier, 957 F.2d at 931. Articulating the right as one of "familial integrity" casts too broad a net. The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; see also Wilson, 526 U.S. at 615. The constitutional right at issue here is the right to procedural and substantive due process before the state takes a child away from his or her parent.

One tried and true way of determining whether this right was clearly established at the time the defendants acted, is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights. Hope, 122 S. Ct. at 2522. This inquiry encompasses not only Supreme Court precedent, but all available case law. Hatch, 274 F.3d at 23.

A parent's liberty interest in the care and custody of her child was established long before the facts of this case arose.

The Supreme Court has noted that "[t]he liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel, 530 U.S. at 65. Applying this substantive due process right in Troxel, four members of the Court found it unconstitutional for a state to fail to give weight to a custodial parent's interests in determining the care of her children when adjudicating a grandparent's contested petition for visitation because the presumption is that a fit parent will act in their child's best interests. Troxel, 530 U.S. at 70-73 (plurality opinion).

The long-standing acknowledgment of a substantive due process interest in familial integrity, e.g., Meyer, 262 U.S. 390, formed the backdrop for the Supreme Court's 1972 opinion in Stanley v. Illinois, 405 U.S. 645 (1972), in which the Court held that procedural due process demanded that a parent be given "a hearing on his fitness as a parent before his children were taken from him," id. at 649. This principle was further developed by the Court in Santosky, in which the Court held that procedural due process required that a person's parental rights not be terminated unless the state's allegations of unfitness were supported by "clear and convincing evidence." 455 U.S. at 769. The Massachusetts Supreme Judicial Court has long recognized parents' rights to procedural due process in cases in which the state intervenes in the care and custody of their children, citing often to the Stanley and Santosky decisions. See, e.g., Opinion of the

Justices, 691 N.E.2d at 913; Adoption of Eugene, 415 Mass. 431, 614 N.E.2d 645, 647 (1993); Dep't of Pub. Welfare v. J.K.B., 379 Mass. 1, 393 N.E.2d 406, 407-08 (1979).

We have no doubt that there is a clearly established constitutional right at stake, although we have found no case exactly on all fours with the facts of this case. The difference in contexts in which the right is discussed in the case law does not mean such a right does not exist. See Hope, 122 S. Ct. at 2515-16 (rejecting requirement that facts of previous cases be "materially similar" to instant case as an overly "rigid gloss" on qualified immunity determinations). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . [T]he salient question . . . is whether the state of the law [at the time of the action] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Id. at 2516.

As the district court stated, "[i]t is clearly established that a parent cannot be deprived of custody of a child absent notice and a hearing unless there are exigent circumstances of abuse or neglect." Suboh, 141 F. Supp. 2d at 143 (citing Stanley, 405 U.S. at 650-57). Even when there are such exigent circumstances, there must be an adequate post-deprivation hearing within a reasonable time. The cases discussing this right are not new and existed long before the events in this case. E.g., Hooks, 771 F.2d at 942; Duchesne, 566 F.2d at 826-28.

Our precedent in Hatch settles the matter. Hatch involved the standard (reasonable suspicion of imminent danger) by which a state actor would be justified in temporarily taking a child from her parent pending a hearing. 274 F.3d at 23-24. Hatch, decided in 2001, found the right clearly established by the time of the events in question there, which occurred in 2000. Our case concerns events in May 1998. Nonetheless, Hatch relied on cases dating from the early and mid 1990s that established due process protections for even temporary removals of children pending a due process hearing. Id. at 20, 23.

Moreover, long before the events at issue in this case, many of our sister circuits had articulated a constitutional right to procedural due process when the state transfers custody from a custodial parent. See, e.g., Weller, 901 F.2d at 393, 398 (finding that complete denial of a hearing following emergency transfer of custody violated due process); see also Wooley, 211 F.3d at 917, 924 (finding that mother's and child's due process rights not to have state deprive mother of custody absent court order or emergency circumstances were clearly established in 1995). In particular, the 1985 Hooks case bears marked factual similarities to this case. 771 F.2d 935. In Hooks, the noncustodial father, who resided out of state, informed the local police of an outstanding warrant against the custodial mother. Id. at 939. The mother attempted to make interim care arrangements for her children, but the police refused to allow her to do so. Id. at 940. She was released on her own recognizance within a few hours

of arrest, but, in the meantime, the police had turned the children over to her ex-husband, who had immediately left the state with them. Id. at 939. The court held that a transfer of custody that "effectively eliminat[ed] the opportunity for . . . a post-deprivation hearing" violated the mother's due process rights. Id. at 942.

It follows from Santosky and Stanley, reinforced by the cases cited in Hatch and those from our sister circuits, that it was clearly established in 1998 that a state official could not effectively resolve a disputed custody issue between a parent and another without following any due process procedures at all. Defendants had fair warning of the existence of these rights. Hope, 122 S. Ct. at 2516.

C. The Understanding of An Objectively Reasonable Officer

The inquiry under the third prong of the qualified immunity analysis is whether an objectively reasonable officer in the defendant's position would have understood his action to violate the plaintiff's rights. See Saucier, 533 U.S. at 205 ("If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."); Swain, 117 F.3d at 9-10. The analysis differs as to Murphy and to Borgioli.

1. Murphy

Unlike Borgioli, Murphy was not given facts indicating that there was any dispute over the custody of the child. Indeed, Murphy's only information on this point, from Borgioli, was that

-25-

the Kandys were the child's lawful custodians.  These facts alone would seem to mandate that Murphy be given qualified immunity.  It is not material that Borgioli's and Murphy's memories diverged over whether there was any discussion of whether to release the child to the Kandys.

Suboh makes two arguments in response.  First, Suboh says Murphy had no legal authority to release the child.  Second, Suboh says that Murphy was negligent in not determining whether there was a custody dispute between Suboh and the Kandys.  Neither argument has merit.

First, the claim as to which immunity is sought is a federal constitutional claim, brought under § 1983, not a state law claim about an individual exceeding his authority.  The constitutional claim does not turn on the scope of the authority of the Assistant District Attorney.  Whether or not he had authority, he simply did not know there was a custody dispute.

Suboh's second argument assumes that there was some fact that should have put Murphy on inquiry notice that there was a custody dispute.  The facts alleged here concerning Murphy's involvement in the matter would not put a reasonable prosecutor on such notice.

The district court denied immunity to Murphy on the basis that Murphy may have given Borgioli legal advice about whether he could turn custody of the child over to the Kandys.  The record is clear that Murphy did not know that there was a custody dispute and, indeed, implicitly was told custody was not in dispute.  Given

-26-

these facts, we cannot say it was unreasonable for Murphy to acede to Borgioli's suggestion that the child be returned to individuals that Murphy was told were her legal guardians. The district court's conclusion cannot stand. Accordingly, we reverse the district court; Murphy is entitled to qualified immunity on the § 1983 claim.

## 2. Borgioli

Borgioli, in contrast, knew that there was a custody dispute from his interrogation of Suboh and knew that Suboh had documents that she said supported her claim to custody. Suboh had shown him a birth certificate that showed her as the birth parent, as well as various other documents that supported her claims. Suboh had also told him that the documentation shown by the Kandys was forged and that the Kandys had lied to him. He knew that the Kandys had given the police inconsistent information about who the birth mother was.

Borgioli argues that it was factually reasonable for him to release the child to the Kandys even if a clearly established right was involved. In essence he makes three arguments. First, he argues that the facts as he knew them indicated that the Kandys were Sofia's custodians. Second, he argues that he had probable cause to arrest Suboh and her husband for kidnapping and that was enough to justify his release of the child. Third, Borgioli argues that ADA Murphy agreed to releasing the child to the Kandys, and that immunizes him. We take each argument in turn.

We, like the district court, think that no reasonable officer could have concluded on the facts before him that the Kandys had undisputed custody of the child, despite Suboh's claims, and so no process of any sort was due before the child could be released to the Kandys. Suboh repeatedly told him that she was the biological mother of Sofia, which directly conflicted with the information provided by the Kandys, who at times said they were the biological parents and had provided a birth certificate indicating that they were the biological parents. Suboh also provided documentation that was obviously different from the documentation provided by the Kandys and which she said supported her claim of custody. Suboh told him that the Kandys' custodial documents were forged. No objectively reasonable officer could immediately conclude that the Kandys' documents were valid and Suboh's documents were forged, or that there was no custody dispute.

Borgioli also failed to pursue reasonable avenues of investigation to determine whether Suboh's claims were true, such as having her documents translated from Dutch, French, and Arabic, or calling the embassies, as Suboh requested. See Wallis, 202 F.3d at 1138 (police should pursue "reasonable avenues of investigation," within circumstances of case, before removing children from parents' custody). It is also relevant that the Kandys' documentation, even if valid, did not give the police authority to effect a transfer of custody, see Mass. Gen. Laws ch. 209B, § 12 (setting forth rules for filing and enforcing custody judgments of foreign states in Massachusetts); Wooley, 211 F.3d at

926 (it was not objectively reasonable for police officer to rely on court custody order to transfer custody when state law required a civil warrant).

We also reject Borgioli's argument that the probable cause determination as to the kidnapping charges entitles a reasonable officer to make a conclusive determination of a disputed custody matter. The threshold for probable cause in a criminal case is low, as Borgioli certainly must know. "[P]robable cause exists when 'the facts and circumstances within [the police officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (quoting United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)) (internal quotation marks omitted). That there is probable cause that a crime has been committed is not a determination on the merits that a crime was committed: an arrest is not a conviction. Indeed, in order to prove kidnapping by a relative, as Borgioli must have known, the state would have had to show that Suboh did not have custody of the child. Mass. Gen. Laws ch. 265, § 26A (2000). As a matter of law, mere probable cause for arrest on kidnapping charges of a person claiming custody is not a sufficient basis on which to determine a custody dispute, nor is an arresting police officer the correct person to be making such a determination. Compare Rivera, 979 F.2d at 263 (articulating standard for probable

cause), with Santosky, 455 U.S. 745 (articulating standard for permanent deprivation of parental rights). While a temporary emergency transfer of custody may issue on the basis of "reasonable cause" to believe that a child is in danger of abuse or neglect, see Care & Prot. of Robert, 556 N.E.2d at 995-96, that is a far cry from a police officer making a custody decision that is effectively nonreversible on the basis of probable cause for arrest for kidnapping by a relative. The probable cause argument works against Borgioli, not for him. A reasonable officer could not view cause for arrest as the extent of the process due before usurping the parent's right to the care and custody of her child.

Borgioli's reliance on Murphy does not help him. Although Borgioli had facts before him that there was a keenly disputed custody issue, he refrained from telling Murphy about that dispute. A reasonable officer would not rely on a district attorney's assent, when he knew the district attorney had not been given the material information. Cf. Rodriques v. Furtado, 950 F.2d 805, 812 (1st Cir. 1991) (there is no qualified immunity if police officer was "constitutionally negligent" and knew that facts submitted in search warrant affidavit were insufficient to establish probable cause).

On the facts alleged by Suboh, Borgioli's actions were not on the "hazy border" between acceptable and unacceptable behavior. Saucier, 533 U.S. at 206 (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)) (internal quotation marks omitted). Whatever the exact contours of the right

to due process in the context of child removals in other circumstances, see, e.g., Frazier, 957 F.2d at 931, this case falls well within the area of clarity. Borgioli cannot prevail on qualified immunity at the summary judgment stage.

IV.

Pendent Jurisdiction

Defendants ask us to take jurisdiction over their appeals from the denial of qualified immunity on the Massachusetts Civil Rights Act claim against Borgioli, the denial of immunity on the Massachusetts Torts Claims Act claims against the District Attorney's office, and the denial of summary judgment on state tort claims against Murphy. Generally, interlocutory review of a decision denying qualified immunity under § 1983 "does not in and of itself confer jurisdiction over other contested issues in the case." Roque-Rodriquez v. Lema Moya, 926 F.2d 103, 105 & n.2 (1st Cir. 1991). In order for the court to exercise pendent jurisdiction, the party seeking jurisdiction must show that the issues are "inextricably intertwined with [the district] court's decision to deny the individual defendants' qualified immunity motions, or that review of the [decision for which pendent jurisdiction is sought] was necessary to ensure meaningful review of the [qualified immunity decision]." Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995); see also Fletcher v. Town of Clinton, 196 F.3d 41, 55-56 (1st Cir. 1999). We have thoroughly reviewed the qualified immunity decision of the trial court without any need to touch on the pendent claims. Consequently, there is no

pendent appellate jurisdiction here.  That said, however, we fully expect that the district court, either sua sponte or upon timely request, will reevaluate its earlier rulings in light of this opinion.

Conclusion

The denial of summary judgment as to Murphy is <u>reversed</u> and the claim against him under § 1983 is ordered dismissed on qualified immunity grounds.  The denial of summary judgment as to Borgioli's claim of qualified immunity is <u>affirmed</u>.  No costs are awarded.  <u>So ordered.</u>