# United States Court of Appeals
## For the First Circuit

No. 02-1904

ANN TOWER, individually and as parent and natural
guardian of William Tower, III and Patricia Tower, minor
children; WILLIAM TOWER, JR., individually and as parent and
natural guardian of William Tower, III and Patricia Tower,
minor children,

Plaintiffs, Appellants,

v.

JOAN LESLIE-BROWN, individually and in her official capacity
as a caseworker for the Maine State Department of Human Services;
DARRYL PEARY, JR., individually and in his official capacity as
a trooper with the Maine State Police,

Defendants, Appellees,

STATE OF MAINE DEPARTMENT OF HUMAN SERVICES;
MICHELLE DOLLEY, individually and in her official capacity as the
guardian ad litem of the children;
MAINE STATE POLICE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Lipez, and Howard, Circuit Judges.

Ferdinand A. Slater for appellants.

Melissa Reynolds O'Dea, Assistant Attorney General, with whom G. Steven Rowe, Attorney General and Paul Stern, Deputy Attorney General, were on brief for appellees.

———————————————

April 22, 2003

———————————————

**HOWARD**, **Circuit Judge**.  This case arises from the events surrounding the arrest of plaintiff William Tower, Jr., and the subsequent removal of the Tower children from their home.  The plaintiffs appeal the denial of their motion for judgment on the pleadings as well as the granting of defendants' motion for summary judgment on the plaintiffs' numerous civil rights claims.  We affirm.

## I.  BACKGROUND

We review the district court's decision de novo, viewing the facts in the light most favorable to the plaintiffs.  See Macone v. Town of Wakefield, 277 F.3d 1, 5 (1st Cir. 2002).  Plaintiffs William Tower, Jr. ("Tower"), and his wife Ann Tower are the parents of five children.  Tower has a fifteen-year-old daughter, Melissa; Ann Tower has two teenaged children, Abigail and Marc; and together the Towers have two young children, William III ("Billy"), three years old, and Patricia, aged eleven months.[1]  All five children lived with the Towers prior to the date of Tower's arrest.

On January 24, 2001, Abigail reported to her high school guidance counselor that she and Marc had been beaten by their stepfather, Tower.  She related three incidents: that Tower had pushed her into a trough in the family's barn that contained sharp

_____

[1] The children's stated ages represent their ages at the time of the arrest and removal.

objects including nails and glass; that he had bent her backwards over a board and beaten her about the face; and that he had knocked Marc down and had hit and kicked him because he believed that Marc had been spying on their stepsister, Melissa, through a hole in the bathroom wall. The guidance counselor also spoke with Marc, who attended the same high school, and who confirmed that this third incident had occurred. Marc further related that Tower had on another occasion chased him around the living room and told him that if he caught him, he would kill him. Marc said that he was afraid to go home, and that he was tired of being hit. The counselor notified the high school principal about the children's reports of abuse, and the principal notified the school superintendent. A school official then forwarded the information to defendant State Trooper Darryl Peary, either in person or by leaving a telephone message. No further action was taken that day.

The next day, Peary went to the high school to interview Abigail and Marc. The children repeated their reports of abuse, and reported additional details about the assault on Marc in which he was repeatedly kicked in the head. They also told Peary about another incident in which Tower hit his own daughter, Melissa. After these interviews, Peary returned to his office in Skowhegan, Maine, to draft a request for a warrant to arrest Tower for misdemeanor assault. He also contacted the Maine Department of Human Services ("DHS"). Based on the information gathered by

Peary, DHS sent two child protective workers, including defendant Joan Leslie-Brown, to interview the children at school. Marc and Abigail repeated their reports, and added that there was ongoing conflict in the house where all five children resided. When Melissa was interviewed, she confirmed that her father had hit her, and that the blow had caused her tooth to go through her lip. She also stated that she was afraid to go home. The children were interviewed separately and by different caseworkers, and their stories were consistent.

As these interviews were taking place, Peary went to the Maine District Court in Skowhegan to submit his warrant request. He presented the warrant application to a clerk, who took the application from him, and then returned a while later to inform him that the warrant was active. Peary did not receive a copy of the warrant.

Peary returned to the high school after having been told the warrant was active, and met with the workers from DHS. One worker stayed with the three teenaged children at the high school, while Peary and Leslie-Brown headed to the Tower residence. Peary went with the purpose of arresting Tower, and Leslie-Brown accompanied him because they expected Tower to be alone with the two younger children at that time of day, and she intended to supervise the children after Tower was arrested and until Ann Tower came home.

At the Tower residence, Peary, Leslie-Brown, and a number of state troopers who had joined them gained entry to the Towers' home, and shortly thereafter, the troopers handcuffed and arrested Tower. During the arrest, Peary took Tower's key ring from him, stating that he needed the key to the gun cabinet.

After the arrest, Peary and Leslie-Brown remained in the house with the two younger children until Ann Tower returned, approximately forty minutes later. During that time, Leslie-Brown called the high school and told the other caseworker to bring the three teenagers home. Peary made a number of long-distance phone calls to other state officers. When Ann Tower arrived, she spoke with Peary as well as Leslie-Brown and the other caseworker. Her conversation with the DHS workers led them to doubt her ability to protect the children, and the caseworkers decided to remove all five children from the home. The children have been out of the Towers' custody ever since.

After taking the children to the DHS office in Skowhegan, the caseworkers drafted a preliminary child protection order to grant DHS emergency custody over them. See Me. Rev. Stat. Ann. tit. 22, § 4034 (West 2002). The caseworkers then went with a supervisor to the home of a Maine Probate Court judge, who granted the petition and issued a preliminary protection order to place the children in DHS custody. A hearing on the order was held five days

later, on January 30, 2001, at which point the Towers consented to the order.

On March 12, 2001, Ann Tower consented to the entry of a "jeopardy order," which represents a finding by the state court that the children were in "circumstances of jeopardy to [their] health or welfare" in her care. See Me. Rev. Stat. Ann. tit. 22, § 4035 (West 2002). Tower contested the entry of a similar jeopardy order against him, but after an adversarial hearing, the order was entered by the court. See In re Melissa T., 791 A.2d 98, 99 (Me. 2002).

On May 1, 2001, the Towers brought the underlying 42 U.S.C. § 1983 action against the Maine State Police, DHS, the children's guardian ad litem, and Trooper Peary and Caseworker Leslie-Brown in their individual and official capacities. On October 9, 2001, the district court dismissed all claims except those against Peary and Leslie-Brown in their individual capacities. See Tower v. Leslie-Brown, 167 F. Supp. 2d 399, 402-04 (D. Me. 2001) (dismissing claims against Maine State Police, Maine DHS, and Peary and Leslie-Brown in their official capacities on the basis that, as state agencies and officials, they are not subject to suit under 42 U.S.C. § 1983; dismissing claims against the children's guardian ad litem for failure to state any factual allegations against her). The plaintiffs chose not to appeal those dismissals, and filed an amended complaint on January 15, 2002,

-7-

seeking relief pursuant to 42 U.S.C. § 1983, and alleging that Peary and Leslie-Brown violated their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights, and violated Title IV-E of the Social Security Act.

On February 21, 2002, the Maine Law Court affirmed the jeopardy orders against both Tower and Ann Tower. See In re Melissa T., 791 A.2d at 99. On February 27, 2002, the state prosecutor dismissed the criminal charges against Tower. On June 19, 2002, the district court entered a sealed order and memorandum granting the defendants' motion for summary judgment on all claims, and denying the plaintiffs' motion for judgment on the pleadings. On June 20, 2002, the district court entered final judgment for the defendants. This appeal followed.

## II. ANALYSIS

The Towers claim that the district court erred in granting the defendants' motion for summary judgment, arguing that the defendants were not entitled to qualified immunity as to their Fourth Amendment claims, and that valid constitutional violations were stated as to their Fifth, Fourteenth, and First Amendment claims. We disagree.

A.      Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The

-8-

Towers contend that this security was violated when defendants entered their home without a warrant, and then proceeded to unreasonably seize and search the premises. They further argue that the district court erred in its conclusion that Peary and Leslie-Brown were entitled to qualified immunity with regard to these alleged violations.

1.    Entry to Arrest

The Towers claim that Peary violated their Fourth Amendment rights by entering their home to arrest Tower without a valid warrant. It is well established that "a non-consensual, non-exigent, warrantless entry into a home to effectuate an arrest transgresse[s] the Fourth Amendment, notwithstanding that probable cause sufficient to justify the same arrest in a more public arena may have existed." Buenrostro v. Collazo, 973 F.2d 39, 43 (1st Cir. 1992) (citing Payton v. New York, 445 U.S. 573, 590 (1980)). In this case, some doubt exists as to whether a valid arrest warrant was issued.

Although the defendants insist that Peary obtained a proper warrant for Tower's arrest, no copy of the arrest warrant has been produced. Instead, the defendants produced a copy of the docket sheet in Tower's criminal case, which stated that a warrant had issued. Unable to determine from the record whether a valid warrant existed, the district court concluded that the plaintiffs had raised, albeit by a slim margin, a genuine issue of fact as to

-9-

whether the arrest warrant had been validly issued. Accordingly, the district court assumed for the purposes of evaluating the defendants' motion for summary judgment that the Towers had stated a Fourth Amendment violation. The defendants do not dispute this conclusion, and there is no suggestion that exigent circumstances existed to alleviate the need for the warrant.

Once we have determined that a viable constitutional claim has been stated, we may move on to the qualified immunity inquiry. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Certainly, the unlawfulness of entering a person's home to effectuate a warrantless arrest in the absence of exigent circumstances was clearly established at the time of Tower's arrest in January 2001. See Payton, 445 U.S. at 590. But the qualified immunity inquiry demands that we ask a second, more specific question: would a reasonable officer have known that it was unlawful to enter the home under the specific circumstances faced? See Anderson v. Creighton, 483 U.S. 635, 637 (1987).

Maine law largely answers this question. By statute, an arresting officer "need not have the warrant in [his] possession at the time of the arrest." Me. R. Crim. P. 4(c)(3). It is

-10-

uncontested that Peary was told by a court employee that a valid warrant had issued. The district court concluded, as do we, that it was reasonable for defendants to rely on the representation of a district court official, and that a reasonable actor would have believed that the warrant had issued.

The Towers argue that the district court improperly failed to engage in an analysis of the defendants' subjective intent and absence of "good faith." In evaluating the officer's conduct, "we do not focus on the official's subjective state of mind, such as bad faith or malicious intention . . . we [must instead] make an objective analysis of the reasonableness of conduct in light of the facts actually known to the officer and not consider the individual officer's subjective assessment of those facts. Nor are actual motives for conduct to be considered in evaluating a qualified immunity defense." Sheehy v. Town of Plymouth, 191 F.3d 15, 19 (1st Cir. 1999) (internal quotations omitted) (quoting Floyd v. Farrell, 765 F.2d 1, 4-6 (1st Cir. 1985)); see also Harlow, 457 U.S. at 818. Because objectively reasonable officers would not have known they were violating the Towers' Fourth Amendment rights by entering their home, the defendants enjoy qualified immunity.

2.    Seizure of Residence

The Towers also assert that the defendants unreasonably seized their property by remaining in their home after Tower had

-11-

been removed. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). However, even if defendants' presence in the home did constitute a seizure, it was not an unreasonable one. See U.S. Const. amend. IV; Soldal v. Cook County, 506 U.S. 56, 61-62 (1992). In circumstances such as this, "we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." Illinois v. McArthur, 531 U.S. 326, 331 (2001). The defendants remained in the Towers' home to preserve the safety of its remaining occupants: the Towers' eleven-month-old and three-year-old children, Billy and Patricia. Because the government has a compelling interest in the welfare of children, see Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993), we find that no Fourth Amendment violation occurred.

The plaintiffs say, however, that Tower was not voluntarily absent from the home. Certainly Tower's arrest and detainment were not of his choosing. Nevertheless, the fact that he would have preferred to remain at home with his children rather than in police custody did not render his absence from the home any less real. The defendants remained in the home to care for the Towers' younger children. The fact that Tower was involuntarily removed from the home on charges of assaulting his older children does not strengthen his argument.

3.      Search of Residence

The Towers' final Fourth Amendment claim is that the defendants improperly searched the residence after Tower was removed.  But a "protective sweep" is permitted.  See Maryland v. Buie, 494 U.S. 325, 334-36 (1990) (permitting arresting officers "to take reasonable steps to ensure their safety after, and while making [an] arrest").

The plaintiffs say that an overly extensive search took place, and cite the appearance of debris from the yard on an upstairs rug and under the stairs, the disappearance of a pair of night vision goggles from Tower's gun cabinet, and an improperly closed night stand drawer.  The defendants deny that there was any search other than Peary's sweep to determine that only the Tower family members were present in the home.  It is undisputed that Peary took the keys to the gun cabinet from Tower, but it is also undisputed that the missing goggles had not been seen for two months prior to the arrest.  The Towers thus have presented no more than a mere scintilla of evidence, which is "insufficient to defeat a properly supported motion for summary judgment."  Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000).

B.      Fifth Amendment

After Tower's arrest, Peary placed a number of long distance phone calls from the Towers' phone while waiting for Ann Tower to return home.  The plaintiffs claim that these phone calls,

-13-

for which they were billed a total of $1.60, violated their Fifth Amendment rights under the Takings Clause. We reiterate that this provision "does not proscribe the taking of property; it proscribes taking without just compensation." Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985); see also U.S. Const. amend. V ("...nor shall private property be taken for public use, without just compensation"); Ochoa Realty Corp. v. Faria, 815 F.2d 812, 816-17 (1st Cir. 1987) (citing Williamson, 473 U.S. at 195). If state law makes "reasonable, certain and adequate" provision for relief, a "property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Williamson, 473 U.S. at 194-95. Further, if no such procedure exists, it is the plaintiffs' burden to prove that a state remedy is unavailable. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 147 (1st Cir. 2002). Because the Towers have not sought reimbursement for the phone calls or established the futility of such a request, this claim fails.

C.      Fourteenth Amendment

The plaintiffs claim the denial of their substantive and procedural due process rights, contesting both the removal of their children from their custody and the lack of notice and hearing prior to such removal.

The liberties protected by the Due Process Clause include "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 65-66 (2000); see also Suboh v. District Attorney's Office of Suffolk, 298 F.3d 81, 91 (1st Cir. 2002). As a general matter, this fundamental right is inviolate, and the deprivation of such right would constitute a violation of substantive due process. Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 22 (1st Cir. 2001). However, "[b]ecause the welfare of the child is paramount, an objectively reasonable suspicion of abuse justifies protective measures." Id. at 21.

The defendants removed the Towers' five children from their care and custody, but no substantive due process violation is stated if there existed a reasonable suspicion that abuse had occurred or that a threat of abuse was imminent at the time of removal. Hatch, 274 F.3d at 22. The defendants had been told by the three older children that Tower struck them. See id. at 21 ("[E]vidence of even a single instance of abuse may . . . warrant immediate state action on a child's behalf."). Conversations with Ann Tower led the defendants to believe that she was either unwilling or unable to prevent further abuse. An objectively reasonable suspicion of abuse existed as to the three older children, as well as an imminent threat of abuse as to all five.

-15-

We now turn to the Towers' procedural due process claims. "Once the state takes temporary custody of a child, it must follow procedures adequate to justify that detention." Hatch, 274 F.3d at 21 n.3. Unless the state employs procedural safeguards against the erroneous deprivation of fundamental rights, a claim for a denial of procedural due process may be stated. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) ("The categories of substance and procedure are distinct.").

Ordinarily, a deprivation of a fundamental right such as the custody of one's children must be preceded by notice and an opportunity to be heard on the matter. See Loudermill, 470 U.S. at 542. However, in cases where the safety of the child is at risk, the parents' rights are not absolute. "[I]n those extra-ordinary situations where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." Suboh, 298 F.3d at 92. There still must be "an adequate post-deprivation hearing within a reasonable time." Id. at 94 (internal quotations omitted); see also Loudermill, 470 U.S. at 542 n.7 ("There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements.")

The post-deprivation hearing took place three business-days after the children's removal, and Leslie-Brown had gone to the home of a Maine Probate Court judge to seek ex parte review of the

-16-

removal decision within hours of the removal. These two opportunities for judicial review satisfied the prompt and fair process requirement due the Towers. See Jordan v. Jackson, 15 F.3d 333, 349 (4th Cir. 1994) (finding no procedural due process violation where child was removed and no ex parte review was sought for sixty-five hours); Cecere v. City of New York, 967 F.2d 826, 830 (2d Cir. 1992) (holding that emergency circumstances justified an immediate removal of the child from her parent, and that a four-day delay without a post-deprivation hearing was constitutionally permissible); see also Berman v. Young, 291 F.3d 976, 985 (7th Cir. 2002) (holding that a 72-day delay in providing a hearing after child was removed was not "prompt and fair" post-deprivation judicial review, but that no harm resulted).

The Towers argue that, despite the post-removal measures taken in this case, no notice or hearing was given before the children were removed. But we have said that state actors may take emergency measures and place a child in temporary custody before obtaining a court order when they have evidence that a child has been abused or is in imminent danger. See Suboh, 298 F.3d at 92. Because such evidence existed here, and because adequate post-removal procedures were employed, the plaintiffs have failed to state a constitutional violation of due process.

D.      First Amendment and Remaining Claims

The Towers claim perfunctorily that their First Amendment rights were violated by Leslie-Brown when she refused to permit the Towers to attend the same religious services, and to refrain from all contact with each other.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  The mere allusion to the infringement of the right to worship or the right to free association is insufficient to put the matter in issue.

Similarly, the plaintiffs state in their reply brief that there remain issues as to substantive and procedural due process, equal protection, and Title IV-E of the Social Security Act that are not argued in their briefs, but which were not intended to be abandoned on appeal.  Despite these protestations, we have made it abundantly clear that failure to brief an argument does, in fact, constitute waiver for purposes of appeal.  See Oritz v. Gaston County Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002); Gosselin v. Massachusetts, 276 F.3d 70, 72 (1st Cir. 2002); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 645 (1st Cir. 2000); Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990).  Any remaining unbriefed arguments are abandoned.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court granting summary judgment to defendants and denying plaintiffs' motion for judgment on the pleadings.

**Affirmed**.