# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 51562 & 51565

| | |
|---|---|
| In the Matter of: ) <br> Child I, Child II, Child III, Child IV, and Child ) <br> V, Children Under Eighteen (18) Years of Age. ) <br> ------------------------------------------------------------- ) <br> STATE OF IDAHO, DEPARTMENT ) <br> OF HEALTH AND WELFARE, ) <br> ) <br>    Petitioner-Respondent, ) <br> ) <br> v. ) <br> ) <br> JANE DOE (2024-04), ) <br> ) <br>    Respondent-Appellant. ) <br> _____ ) <br> ) <br> In the Matter of: ) <br> Child I, Child II, Child III, Child IV, and Child ) <br> V, Children Under Eighteen (18) Years of Age. ) <br> ------------------------------------------------------------- ) <br> STATE OF IDAHO, DEPARTMENT ) <br> OF HEALTH AND WELFARE, ) <br> ) <br>    Petitioner-Respondent, ) <br> ) <br> v. ) <br> ) <br> JOHN DOE (2024-05), ) <br> ) <br>    Respondent-Appellant. ) <br> _____ ) | Boise, June 2024 Term <br><br> Opinion Filed: September 6, 2024 <br><br> Melanie Gagnepain, Clerk |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Anson L. Call, Magistrate Judge.

The adjudicatory decree of the magistrate court is <u>affirmed</u>.

Willis Law Office, PLLC, Pocatello, for Appellant Jane Doe. R. Bradley Willis submitted argument on the briefs.

1

Parrish Law Office, Pocatello, for Appellant John Doe. Craig W. Parrish submitted argument on the briefs.

Stephen F. Herzog, Bannock County Prosecutor, for Respondent State of Idaho. Alan J. Boehme submitted argument on the briefs.

Raúl R. Labrador, Idaho Attorney General, for Respondent Idaho Department of Health and Welfare. Jason R. Chandler submitted argument on the supplemental brief.

David R. Martinez, Chief Bannock County Public Defender, for Respondents Jane Doe I, Jane Doe II, Jane Doe III, Jane Doe IV, and John Doe I. Jessalyn R. Hopkin submitted argument on the briefs.

_____

BRODY, Justice.

This is a consolidated appeal that arose from a Child Protection Act proceeding. Jane Doe ("Mother") and John Doe ("Father") (collectively, "Parents") are the biological parents of five minor children. In 2023, the State removed the children from the Parents' home following allegations of physical abuse. Thereafter, the magistrate court vested temporary custody of the children with the Department of Health and Welfare ("IDHW") following a shelter care hearing, and, again, after an adjudicatory hearing. Parents appealed, challenging the constitutionality of the initial emergency removal of the children. Parents also challenge the magistrate court's orders vesting custody of the children with IDHW following the shelter care and adjudicatory hearings. For the reasons set forth below, we affirm the magistrate court's adjudicatory decree.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father are the biological parents of five minor children who ranged in age from approximately sixteen years old to fourteen months old at the time of the proceedings at issue: Child I (age 16), Child II (age 15), Child III (age 13), Child IV (age 9), and Child V (age approximately 14 months old) (collectively, "the Children"). In 2021, the family moved to Idaho after it was revealed that Child I, Child II, and Child III were sexually abused by two other adult male family members over an extended period of time. The record is unclear as to whether Child IV was also subject to sexual abuse by the same family members.

On December 5, 2023, law enforcement from the Bannock Country Sheriff's Office arrived at the Parents' home in response to a report of an altercation between Mother and Child I. Law enforcement spoke with Child I, who explained that Mother had struck her upper arms with a

small, plastic baby clothes hanger after Child I refused to help fold laundry. Law enforcement photographed Child I's upper arms, which had "red raised marks", and took possession of a broken plastic clothes hanger identified by family members as the one that was used on Child I. Law enforcement then spoke with Mother, who admitted to hitting Child I with the hanger twice. Child I subsequently informed law enforcement that she was hit "approximately four times with the hanger."

Law enforcement also spoke with Child II, Child III, and Child IV, who each stated that they were often hit with belts, hands, or other objects. Child II also disclosed that, on the previous night, Father had become angry and pushed her down on the bed causing her to hit her head. Law enforcement also learned that Child V, a toddler, was physically disciplined by having his hands struck when he misbehaved. Thereafter, law enforcement declared the Children to be in imminent danger and removed them from the home.

The day after removal, the Bannock County Prosecutor's Office filed a petition under the Child Protective Act ("CPA"), requesting that the Children be placed in the legal custody of IDHW. The petition was supported by an affidavit from the assigned social service worker for IDHW and a police report from the Bannock Country Sheriff's Office. This affidavit stated that the social service worker observed marks and bruises on both arms and the left shoulder of Child I and that she had taken photos of these injuries. The affidavit also stated that Parents "admitted to law enforcement that they use[d] a belt to discipline" the Children. However, during a subsequent adjudicatory hearing, Parents testified that they stopped using a belt to discipline Child I, Child II, and Child III after moving to Idaho, and Father testified that they had never used a belt to discipline Child IV and V. The affidavit further stated that there was "an unsuccessful attempt to find suitable relatives in the area for placement."

The magistrate court held a shelter care hearing the day after the CPA petition was filed. During the hearing, the State requested that the Children remain in shelter care or, in event that the Children were returned home, that the magistrate court appoint the Children's grandmother as a safety monitor in Parent's home during the "waking hours." A social worker with IDHW expressed concern that such an arrangement would not be realistic long term:

> [A]t this time if they do go home, then we would like it to be under protective supervision with a safety monitor, like [State's counsel] said. I'm just not quite sure how realistic it would be with a safety monitor. The family did identify grandma . . . but it would have to be a safety monitor that's in the home basically 24/7 when

the kids are there because the physical discipline or altercations are happening, it sounds like, at unpredictable times, and so they need someone to be there with them. So I'm just not quite sure how realistic that would be long term. So that's my only concern with sending the kids home.

Children's counsel informed the magistrate court that the three oldest children did not want to go home, even if their grandmother was present as a safety monitor, and represented that the physical discipline had been increasing in past months and was happening almost daily:

> The report that I'm getting from the kids is that there's a lot of yelling, a lot of arguing in the home, and that the physical portion of that has escalated in the past month or two; that there's physical things happening in the home weekly, if not daily, at this point, and they just don't feel comfortable going home. They are afraid that if they go home and . . . there's nothing in place, I think even with a safety assessor -- I asked them about whether if grandma's there they feel more comfortable, and they still stated no.

However, Children's counsel also represented that the oldest three children believed that Child V "would be fine in the home."

Parents objected to the State's request for shelter care. Mother's counsel argued that this was a case of parental discipline that fell within Parents' fundamental right to discipline the Children. However, Mother's counsel also acknowledged that this case fell "somewhere more in the gray area" on the "spectrum of perfect parenting and illegal parenting":

> I think what we have here is a case of parental discipline, which, as the [c]ourt is aware, parents have a fundamental right to the control and discipline of their children. While on the spectrum of perfect parenting and illegal parenting, this seems to fall somewhere more in the gray area in between with an out-of-control teenager that is pushing the boundaries at home, escalating things, and now the teenager and her friend have escalated to making police reports based upon the discipline and the failure to follow the rules in the home.

At the end of the hearing, the magistrate court, ruling from the bench, found reasonable cause to believe that the children came within the jurisdiction of the CPA due to abuse or an unstable home environment. Initially, the magistrate court detailed the evidence it considered in reaching its conclusion. The magistrate court noted, based on the testimony presented and the judge's own observations, that the Children were "fearful to return home at this point in time," but that it could not "determine whether that's simply based on the fact that they misbehave and are wanting to avoid appropriate discipline for their behaviors or whether that discipline has gone beyond what is appropriate." The magistrate court also noted that Child I reported being struck by a belt during a different incident and that photographs of bruising resulting from that incident had

4

been submitted with the police report; however, the magistrate court declined to consider these photographs because they were submitted as part of an email that the magistrate court had not seen. The magistrate court also expressed concerns about the report that Father had pushed Child II "down on the bed causing her to hit her head" but noted that the lack of information concerning the circumstances and the severity of this incident prevented a "full determination" on that matter. Still, based on the affidavit, police report, and testimony given during the hearing, the magistrate court concluded that, "it does appear that at least at times" that the injuries suffered by the children "exceeded what would be appropriate" and it was clear that "there's significant conflict in the home."

> What is clear to me is there's significant conflict in the home. The children, the older children, don't feel safe in the home right now. And there have been observed injuries and reports of significant injuries that have been presented to the [c]ourt today.

The magistrate court further determined that the Children could not be placed in the sole custody of either Father or Mother given the allegations "that both parents have used excessive physical discipline with the children," and that IDHW had made reasonable efforts to eliminate the need for shelter care by attempting to locate other family members that could intervene with the Children's placement. Accordingly, the magistrate court found that it would be "contrary to the welfare of the children to remain in the home" and it was "in the children's best interest to remain in temporary shelter care." Following an objection from Father's counsel concerning the custody of Child V who was only about one-year-old at the time, the magistrate court explained it would not send the baby back into an environment where the baby has been physically disciplined, there has been inappropriate discipline in the home, and there was no way of ensuring that it was not happening to the baby:

[Father's counsel:] Babe in arms back with his mom? You don't think we better send that baby back? It's not like they're 10-, 12-year-olds that play together. That's a tiny baby, never been anywhere else but with their mom.

. . . .

[The court:] Well, the report I got was the four older children have been subjected to physical discipline. Even the baby has been subjected to physical discipline, the striking of the hands, is the report that I have at this point in time.

5

So I send children home that can't speak or identify for themselves what's happening in the home? I understand the trauma that I cause by removing a child, particularly a young child; but with the report that I have, I think what I do is I send an infant back into an environment where the report is there's inappropriate physical discipline, and I don't have a way of having that supervised or making sure that's not happening.

And so I'm going to order removal of all of the children at this time, based on the allegations that have been made[.]

The magistrate court scheduled an adjudicatory hearing to take place within thirty days of the shelter care hearing, on January 4, 2024, as required by Idaho Code section 16-1619(1). Prior to the adjudicatory hearing, the magistrate court received an adjudicatory disposition report of investigation from IDHW, which recommended that temporary legal custody remain vested with IDHW. The magistrate court also received the adjudicatory report from the Children's guardian ad litem, which recommended that the Children remain under the protective supervision of IDHW.

The magistrate court conducted an adjudicatory hearing over three days on January 4, 5, and 26, 2024. Initially, Mother and Father requested the Children be excluded from the courtroom during testimony due to the sensitive nature of the material being discussed, the fact that the Children could be called to testify, and because the Children were not parties to the case. The Children's counsel requested that the three oldest children remain in the courtroom "as they are parties to the case, and . . . have an interest in being here." The magistrate court excluded the two younger children, Child IV and Child V, but permitted the older children, Child 1, Child II, and Child III to stay.

The magistrate court then heard testimony from Mother, Father, and Child I. Parents denied regularly using physical discipline, but consistently stated they did not recall details relative to their discipline of the children. Parents testified that Child I displayed behavioral issues at home and at school shortly after moving to Idaho. Among other things, Parents testified that Child I was placed on probation after she was caught vaping and drinking at her school and was arrested for committing a battery against a student. Parents further testified that Child I began sneaking out of her home in 2023, and, in one instance, wrecked the family car after she took the vehicle without permission (and without a driver's license) and crashed into their garage.

Mother admitted that she struck Child I with the clothes hanger while arguing with her about chores on December 5, 2024, and that she had previously slapped Child I while living in

6

Idaho after Child I "put[] her finger on my face" and screamed at Mother. Mother further recounted that, before moving to Idaho, Parents had disciplined the Children by spanking their hands, arms, legs or backs and had previously used a belt to hit the Children "when [they] were leaving" their prior state in 2021. Father admitted that he had previously struck Child I, Child II, and Child III with a belt before moving to Idaho, but could not recall exactly when he stopped using the belt when living in their prior state. Father further remarked that he had collectively punished the children but did not specify if or when the "all-or-nothing" punishment system ended.

Child I testified that, prior to moving to Idaho, Mother infrequently struck her. However, Child I also recalled, while living in Idaho, Mother dragging her by her hair across the living room floor in two separate instances, Father striking her and her siblings with his hands and with a belt, and Father pulling her hair and Child II's hair. Child I further recounted that, in September 2023, Father struck her leg multiple times with a belt when she was asleep on the couch and, on December 4, 2023, Father had grabbed Child II's hair, "pushed her onto the bed, [and] she hit her head on the wall."

The Parents renewed their objection to exclude the remaining children from the courtroom during testimony on the second day of the hearing. However, before addressing the renewed objection, the magistrate court continued the hearing *sua sponte* after Father complained of chest pains and was subsequently taken to the hospital from the courthouse by paramedics.

The adjudicatory hearing resumed on January 26, 2024. At that time, the Parents stipulated to the jurisdiction of the magistrate court under the CPA, due to the lack of a stable home environment. After a colloquy with the Parents concerning the consequence of the stipulation, the magistrate court accepted the stipulation and further determined that the stipulation to jurisdiction had a "reasonable basis in fact" based on prior testimony. The magistrate court then opted to take testimony from the remaining older children, Child II, Child III, and Child IV, on the record and outside the presence of the parties and counsel to determine the disposition of the Children. When speaking to the magistrate court, each child recalled various instances of abuse while living in Idaho, of being struck by Father or Mother with their hands or a belt, and witnessing their siblings being struck by their Parents. Each child also expressed to the magistrate court that they were fearful of being returned home. Child II testified, among other things, that Father (1) struck her with a belt "multiple times" after she declined his request to make dinner, (2) pulled her back into

7

their home by her hoodie, which choked her, and (3) slammed her face into her bed after she tossed her phone near Mother during an argument:

| | |
|---|---|
| [Child II]: | There was a time where he wanted me to cook dinner, and I did not want to because at that time I didn't like cooking with oil. And so he got a belt and he hit me multiple times, and it also left skid marks on the wall too. |
| [The court:] | Sorry. You said -- what kind of marks did it leave? |
| [Child II]: | It left marks on me, like I had marks on my thighs. |
| [The court:] | Okay. |
| [Child II]: | And it also left marks on the wall from the belt. |
| [The court:] | Okay. So do you remember where you were standing when he was hitting you with the belt? |
| [Child II]: | I was actually sitting in a corner backing away from him. |
| [The court:] | Do you remember, were you facing towards him or away from him? |
| [Child II]: | I was facing towards him. I had like my knees up. That's why I had marks on my thighs.<br>. . . |
| [The court:] | Okay. How often did either of your parents discipline you physically like that when you lived on [xxxxxx]? |
| [Child II]: | Pretty often. |
| [The court:] | Okay. |
| [Child II:] | There was another time where my dad -- me and my dad got in a fight about school and he -- like I was crying on the floor and he called me effing crazy, and he tried (indiscernible) me to a mental institution, and he had called like Pocatello hospital. He called the one in Idaho Falls. He like took my clothes and dumped them on the couch and he's like -- and at one point he was like, "Why don't you just leave?" And so I walked out, and he grabbed my hood and like it choked me; he pulled me back in the house while the hood was choking me and put me back on the floor.<br>. . . |
| [The court:] | Okay. Do you remember in your house on [xxxxxx] Street if your parents were ever violent toward you? |
| [Child II:] | Not that I can remember. Because at that point I had just stopped getting in fights with my parents -- |
| [The court:] | Okay. |

8

| [Child II:] | -- because it never led to anything good. So at that point I was -- I just stayed quiet for the most part. |
| | . . . |
| [The court:] | Okay. And do you remember anything happening -- do you remember anybody being violent to you at your house on [xxxxx]? |
| [Child II:] | This was the night before we got taken away. A big argument had broken out about something . . . [w]ith [Child I], and then it ended up with [Child III] getting in the argument. And then my parents -- specifically my dad had blown up and started yelling at us and called us into the room. And so he had taken my phone away. And I did get in an argument with him about it, saying that I didn't do anything. And I literally sat there and did nothing. And his reasons were – to take my phone had nothing to do with me, so I ended up just tossing my phone onto the bed and it almost hit my mom in the face by accident. And so he decided to scream in my face and grabbed me by my hair and slammed my head into the [mattress of the] bed. |

At the close of evidence, the magistrate court reconvened the hearing with the parties present to issue its findings and conclusions. Initially, the magistrate court remarked that it was concerned about the violence the children had recounted, which informed the parties that the children recalled instances of violence that "went beyond appropriate discipline" and "to a point of what I would define as child abuse":

> It sounded like each of the kids could remember a lot of instances of violence in your home. Whether that was in [a prior state], I think some violence was brought up when you'd go on a trip to California sometimes, violence in your homes here in Idaho . . . [E]ach of them had their own experiences where things had happened either to them or they'd seen things happen with their siblings that were of concern to me, . . . it went beyond appropriate discipline to a point of what I would define as child abuse. So I'm concerned about that.

The magistrate court then found that "it would be contrary to the welfare of the children to be returned home at this time and it's in their best interest to remain in the legal custody of the [IDHW] pending some further work in the case." Accordingly, the magistrate court placed the Children in the legal custody of IDHW. However, the magistrate court permitted Child V to be under an extended home visit with Parents while still in the legal custody of IDHW. The magistrate court also ordered that there would be "no physical discipline of any children in the home moving forward in this case." The magistrate court subsequently entered a written adjudicatory decree with the court's findings and conclusions.

9

## II. STANDARDS OF REVIEW

"A party to a Child Protective Act proceeding may bring a direct permissive appeal to this Court from the orders and decrees specified under Idaho Code section 16-1625(1)." *Idaho Dep't of Health & Welfare v. Doe (2023-25)*, 173 Idaho 32, 37, 538 P.3d 805, 810 (2023). "The Supreme Court reviews the magistrate court record to determine whether there is substantial, competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings." *Id*. (quoting *Idaho Dep't of Health & Welfare v. Doe*, 151 Idaho 300, 303, 256 P.3d 708, 711 (2011)).

> "Decisions regarding child custody are committed to the sound discretion of the magistrate, and the magistrate's decision may be overturned on appeal only for an abuse of discretion." *Nelson v. Nelson*, 144 Idaho 710, 713, 170 P.3d 375, 378 (2007) (quoting *McGriff v. McGriff*, 140 Idaho 642, 645, 99 P.3d 111, 114 (2004)). "An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification." *Id.* (quoting *McGriff*, 140 Idaho at 645, 99 P.3d at 114). "Appellate courts, however, are not permitted to substitute their own view of the evidence for that of the trial court, or to make credibility determinations." *Id.*
>
> "When reviewing the trial court's findings of fact, the appellate court will not set aside the findings on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence." *Id.* (quoting *Reed v. Reed*, 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002)). "If the findings of fact are based on substantial evidence, even if the evidence is conflicting, they will not be overturned on appeal." *Id.* (quoting *State v. Hart*, 142 Idaho 721, 723, 132 P.3d 1249, 1251 (2006)). "When reviewing the trial court's conclusions of law, however, this Court exercises free review of the court's decision to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found." *Id.* (quoting *Hart*, 142 Idaho at 723, 132 P.3d at 1251).

*Id*.

"Constitutional issues and the construction and application of legislative acts are pure questions of law over which this Court exercises free review." *BABE VOTE v. McGrane*, 173 Idaho 608, ___, 546 P.3d 694, 702 (2024) (quoting *Nelson v. City of Pocatello*, 170 Idaho 160, 166, 508 P.3d 1234, 1240 (2022)).

"Whether a court lacks jurisdiction is a question of law that is freely reviewed by this Court." *Idaho Dep't of Health & Welfare v. Jane Doe (2022-36)*, 171 Idaho 692, 695, 525 P.3d 730, 733 (2023). Likewise, "[j]usticiability issues, such as mootness, are freely reviewed." *Blaskiewicz v. Spine Inst. of Idaho, P.A.*, 171 Idaho 201, 205, 519 P.3d 1141, 1145 (2022) (quoting

*State v. Barclay*, 149 Idaho 6, 8, 232 P.3d 327, 329 (2010)). This Court is obliged to raise mootness *sua sponte* because it is a jurisdictional issue." *Webb v. Webb*, 143 Idaho 521, 524, 148 P.3d 1267, 1270 (2006) (citing *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir.2005)).

## III.   ANALYSIS

On appeal, Parents challenge three decisions that interfered with their care, custody, and control of the Children at various stages of the CPA proceedings. First, Parents contend that the State's initial removal of the Children—without a warrant or evidence of imminent danger—violated their Fourth and Fourteenth Amendment rights and that the appropriate remedy for such violation is dismissal of the CPA case. Second, Parents contend that the magistrate court erred by placing the Children in shelter care because the magistrate court's findings were unsupported by substantial and competent evidence. Third, Parents contend that the magistrate court erred by vesting legal custody of the children in IDHW at the adjudicatory hearing. We address each issue in turn.

### A. We decline to rule on whether the initial removal of the Children violated Parents' Fourth and Fourteenth amendment rights because Parents failed to raise the issue before the magistrate court.

Parents contend that the emergency removal of the Children from Parents' custody violated their due process rights under the Fourteenth Amendment and their right to be free from unreasonable search and seizure under the Fourth Amendment, and that the appropriate remedy for such violations is dismissal of the CPA case. Relying on the decision of the United States District Court for the District of Idaho in *Ingram v. Mouser*, No. 1:19-CV-00308-DCN, 2024 WL 249364, at *4 (D. Idaho Jan. 23, 2024), Parents argue that the warrantless removal of their Children without evidence of imminent danger violated their Fourth and Fourteenth Amendment rights, and that, rather than pursuing damages under a 42 U.S.C. § 1983 action, the appropriate remedy for such violation was dismissal of the CPA case. As an alternative to dismissal, Mother also requests that we overrule the Idaho Court of Appeals' decision in *Idaho Department of Health and Welfare v. John Doe I*, 150 Idaho 103, 244 P.3d 247 (Ct. App. 2010), and hold that the exclusionary rule is applicable in the context of a child protection case. In response, IDHW contends that the initial removal complied with state and federal law governing emergency removal and, even if there was a violation, any remedy in the child protection case would be unwarranted and detrimental to the welfare of the Children.

11

Parents' argument raises important constitutional questions that have not been addressed by this Court concerning the emergency removal of children without a court order. The State's seizure of a child implicates several overlapping and potentially conflicting interests, including: (1) the interest of the parents in the care, custody, and control of their children; (2) the interest of the children in being free from unreasonable seizure by the state; and (3) the interest of the state, as sovereign or *parens patriae*, in assuring the welfare of children within its jurisdiction. " '*Parens patriae*,' literally 'parent of the country,' refers traditionally to role of state as sovereign and guardian of persons under legal disability." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (quoting Black's Law Dictionary 1003 (5th ed. 1979)).

"The rights of parents over 'the care, custody, and control of their children . . . [are] perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.' " *Overholser v. Overholser*, 164 Idaho 503, 507, 432 P.3d 52, 56 (2018) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *see also Stanley v. Illinois*, 405 U.S. 645, 649–52 (1972) (alterations in original) (rights to conceive and raise one's children have been deemed "essential" and "basic civil rights of man"). "This liberty is protected by the due process clause of the Fourteenth Amendment, which guarantees fair process when the state deprives a parent of his right to raise his child." *Overholser*, 164 Idaho at 507, 432 P.3d at 56 (first citing U.S. Const. amend. XIV, § 1; then citing *Troxel*, 530 U.S. at 65); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (addressing the "Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"). This guarantee includes "both substantive and procedural components, thus placing a high burden of proof on the state and guaranteeing parents 'fundamentally fair procedures' " before the " 'state interven[es] into ongoing family affairs.' " *Scanlon v. County of Los Angeles*, 92 F.4th 781, 798 (9th Cir. 2024) (quoting *Santosky*, 455 U.S. at 753–54).

In the context of 42 U.S.C. § 1983 actions, certain federal circuit courts have also recognized that the rights of parents over the care, custody, and control of their children are protected by the Fourth Amendment, made applicable to the states by the Fourteenth Amendment. *See, e.g.*, *Scanlon*, 92 F.4th at 797–98 (observing that, "[a]lthough the Supreme Court has largely grounded this right in the Due Process Clause, we have also found it to be protected by the . . . Fourth Amendment[]"); The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that

"no [w]arrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed[.]" *United States v. United States District Court*, 407 U.S. 297, 313 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Absent exigent circumstances, the threshold of a home "may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573 (1980).

The rights of parenthood, however, are not "beyond limitation." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The state, as sovereign or *parens patriae*, may restrict parents' control in many ways when acting to protect children's wellbeing. *Id.*; *see also Tower v. Leslie-Brown*, 326 F.3d 290, 298 (1st Cir. 2003) ("[I]n cases where the safety of the child is at risk, the parents' rights are not absolute."); *White by White v. Chambliss*, 112 F.3d 731, 735 (4th Cir. 1997) (citation omitted) ("The parent's right to custody is subject to the child's interest in his personal health and safety and the state's interest as *parens patriae* in protecting that interest."); *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) ("The state's interest in preserving the welfare of children is at its zenith when the life of the child is at stake, and in such circumstances the state in its role of *parens patriae* may subordinate the interest of the child's parents to its own interest in keeping the child alive."). As the Sixth Circuit noted, the parents' constitutionally protected interest in family integrity must be balanced against the compelling state interest in protecting minor children from abuse:

> Although it has recognized this abstract fundamental liberty interest in family integrity . . . the Supreme Court has yet to articulate the parameters of this right. Nonetheless, what is clear is that the right to family integrity, while critically important, is neither absolute nor unqualified. The right is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents. Governmental entities have a traditional and transcendent interest in protecting children within their jurisdiction from abuse. Thus, although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is necessary as against the parents themselves.

*Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006) (internal citations and quotation marks omitted).

13

To strike a balance among the interests of parents, children, and the state, federal circuit courts have used various formulations to determine whether circumstances existed to justify a warrantless seizure of a child. In some circuits, a warrantless seizure of a child can be predicated on reasonable suspicion of past abuse. *See, e.g.*, *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 21-22 (1st Cir.2001); *Berman v. Young*, 291 F.3d 976, 983–84 (7th Cir. 2002). In other circuits, such as the Ninth Circuit, a warrantless seizure of a child can be predicated on reasonable suspicion of imminent abuse. *See Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000) ("Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."). Other approaches abound. However, for the reasons set forth below, we decline to consider whether the State's warrantless removal of the Children in this case violated Parents' constitutional rights under any of these formulations.

Foremost among the reasons for declining to rule on Parents' argument is their failure to raise these arguments below. "[T]his Court has made clear that a central rule of appellate review is that '[t]his Court will not consider issues raised for the first time on appeal.' " *Hall v. State*, 172 Idaho 334, 533 P.3d 243, 261 (2023) (second alteration in original) (quoting *State v. Hoskins*, 165 Idaho 217, 221–22, 443 P.3d 231, 235–36 (2019)). "The rule fosters the full testing of issues by the adversarial process, ensures that factual records are fully developed, aids the Court in the correct resolution of cases through the refinement of . . . arguments on appeal and the wisdom of the trial court in deciding the matter in the first instance, and serves interests of efficiency and finality." *Carver v. Hornish*, 171 Idaho 118, 124, 518 P.3d 1175, 1181 (2022) (alteration in original) (internal quotation marks omitted) (citing *State v. Howard*, 169 Idaho 379, 496 P.3d 865, 871 (2021)).

Subsidiary to this rule is the Court's interest in ensuring that its decision is fully informed. "When deciding whether an individual's constitutional rights have been violated, this Court must independently decide whether the facts on the record show a violation of the fundamental constitutional rights at issue." *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 67–68, 28 P.3d 1006, 1010–11 (2001). Here, the issue of whether the State's warrantless seizure of Children violated Parents' constitutional rights is a highly fact intensive inquiry. Because this issue was not raised

14

below, the parties did not introduce any evidence on this matter for the magistrate court to weigh and the magistrate court did not render findings or conclusions on the reasonableness of the seizure. Therefore, it is not possible for this Court to determine whether Parents' constitutional rights were violated because the factual record on this matter was never developed. *See State v. Heath*, 168 Idaho 678, 685, 485 P.3d 1121, 1128 (2021) ("Our role is not, and has never been, to decide the facts in the first instance.")

Furthermore, even if Parents' constitutional rights were violated by the State's initial seizure of the Children, Parents would not be entitled to the remedies they seek. First, Parents failed to cite (nor did we find) any authority to support their claim that dismissal of the CPA proceedings would be warranted if the State violated their Fourth or Fourteenth Amendment rights during the emergency removal. Second, Parents failed to cite any cases in which another jurisdiction has applied the exclusionary rule in the context of child abuse and neglect proceedings. Rather, as the Idaho Court of Appeals noted in *Idaho Department of Health and Welfare v. John Doe I*, "other jurisdictions that have addressed the issue have consistently held that the Fourth Amendment exclusionary rule (or its state constitutional equivalent) is inapplicable in proceedings for the purpose of determining whether the transfer of custody or some other steps should be taken for the purpose of ensuring the protection of a juvenile." 150 Idaho 103, 111, 244 P.3d 247, 255 (Ct. App. 2010) (citing 1 Wayne R. LaFave, *Search & Seizure* § 1.7(e) (4th ed. 2004)); *see also People ex rel. A.E.L.*, 181 P.3d 1186 (Colo. App. 2008) (societal costs of applying exclusionary rule would exceed any deterrent effect exclusion would have on the police in investigating a child welfare issue); *In re Corey P.*, 697 N.W.2d 647, 934 (Neb. 2005) ("[A]pplication of the rule in juvenile proceedings may lead to an erroneous conclusion that there has been no abuse or neglect, leaving innocent children to remain in unhealthy or compromising circumstances"); *State ex rel. Dep't of Hum. Services v. W.L.P.*, 202 P.3d 167 (Or. 2009) (en banc) (neither the state nor federal constitution requires application of exclusionary rule in juvenile dependency proceedings).

In sum, while this case presents important constitutional questions, it is not an appropriate case to answer these questions because the issue was not presented below and the factual record on the matter was not developed. Moreover, even if we were to consider the argument, Parents would not be entitled to dismissal of the CPA proceeding in the event we determined that the removal violated their constitutional rights. Therefore, we decline to consider whether the State's warrantless removal of the Children violated Parents' constitutional rights.

15

**B. Parents' challenge to the magistrate court's shelter care order is unavailing.**

Parents challenge the magistrate court's shelter care order placing the Children in the temporary custody of IDHW pending the adjudicatory hearing. "Shelter care" is a place "designated by the [IDHW] for temporary care of children pending court disposition or placement." I.C. § 16-1602(42). Pursuant to section 16-1615(5), Idaho Code, a court may place a child in the temporary legal custody of IDHW when

(a) A petition has been filed; and

(b) There is reasonable cause to believe the child comes within the jurisdiction of the court under this chapter and either:

(i) The department made reasonable efforts to eliminate the need for shelter care but the efforts were unsuccessful; or

(ii) The department made reasonable efforts to eliminate the need for shelter care but was not able to safely provide preventive services; and

(c) The child could not be placed in the temporary sole custody of a parent having joint legal or physical custody; and

(d) It is contrary to the welfare of the child to remain in the home; and

(e) It is in the best interests of the child to remain in temporary shelter care pending the conclusion of the adjudicatory hearing.

I.C. § 16-1615(5).

Here, Parents contend that the magistrate court's best interest determination under subsection (e) was unsupported by substantial and competent evidence. Parents further argue that the magistrate court's determination that it was contrary to the welfare of the Children to remain in the home under subsection (d) was unsupported by substantial and competent evidence. In response, IDHW contends that this Court lacks appellate jurisdiction to address the propriety of the shelter care order because it is not an enumerated appealable order or decree under Idaho Code section 16-1625. IDHW and the Children also contend that the magistrate court's shelter care findings and conclusions were supported by substantial and competent evidence.

*1. The shelter care order is not reviewable and presents a moot issue given the issuance of the adjudicatory decree.*

Before we discuss the merits of Parents' argument, we first must address IDHW's argument concerning this Court's appellate jurisdiction. "This Court must have appellate jurisdiction over a claim before it can reach the claim's merits." *State v. Wolfe*, 158 Idaho 55, 60, 343 P.3d 497, 502 (2015) (citing *Martin v. Soden*, 80 Idaho 416, 419, 332 P.2d 482, 483 (1958)).

16

"Thus, the question of this Court's jurisdiction comes before all other questions. . . ." *Id*. (citation omitted).

We agree with IDHW that the shelter care order does not fall within the scope of reviewable orders under Idaho Code section 16-1625. Rule 49(a) of the Idaho Juvenile Rules, as well as Idaho Appellate Rules 11.1(b) and 12.1(a), allow a party to a Child Protective Act proceeding to appeal from the orders and decrees identified in Idaho Code section 16-1625(1). This statutory provision provides:

> (1) An aggrieved party *may appeal the following orders or decrees of the court* to the district court, or may seek a direct permissive appeal to the supreme court as provided by rules adopted by the supreme court:
>
> > (a) An adjudicatory decree entered pursuant to section 16-1619, Idaho Code;
> >
> > (b) Any order subsequent to the adjudicatory decree that vests legal custody of the child in the department or other authorized agency;
> >
> > (c) Any order subsequent to the adjudicatory decree that authorizes or mandates the department to cease reasonable efforts to make it possible to return the child to his home, including an order finding aggravated circumstances; or
> >
> > (d) An order of dismissal.

I.C. § 16-1625(1)(a)–(d) (emphasis added). While a shelter care order vests temporary legal custody of the child in IDHW, this order precedes the adjudicatory decree. *See* I.C. 16-1615(5)–(6). Therefore, an appeal of a shelter care order is not authorized by our court rules or by statute.

Moreover, we also agree with IDHW that the issue of whether the magistrate court properly placed the Children in shelter care is moot. "An issue becomes moot if it does not present a real and substantial controversy that is capable of being concluded through judicial decree of specific relief." *Boe v. Boe*, 163 Idaho 922, 927, 422 P.3d 1128, 1133 (2018) (quoting *Nampa Educ. Ass'n v. Nampa Sch. Dist. No. 131*, 158 Idaho 87, 90, 343 P.3d 1094, 1097 (2015)). "Stated differently, mootness 'applies when a favorable judicial decision would not result in any relief. This Court may only review cases in which a judicial determination will have a practical effect on the outcome.' " *Id*. (quoting *Houpt v. Wells Fargo Bank, Nat'l. Ass'n*, 160 Idaho 181, 189, 370 P.3d 384, 392 (2016)). Here, the shelter care order, and the order continuing the adjudicatory hearing after Father's medical event during the hearing, temporarily placed the Children in the custody of IDHW pending the resolution of the adjudicatory hearing. Thereafter, the shelter care order was

17

supplanted by the adjudicatory decree entered by the magistrate court at the conclusion of the hearing on January 26, 2024. Consequently, a judicial determination on the propriety of the shelter care order will no longer have any practical effect on the outcome of this litigation, rendering this issue moot.

> 2. *The lack of appellate review of the shelter care order does not violate the Fourteenth Amendment's Due Process or Equal Protection Clauses.*

Mother concedes that the shelter care order falls outside the boundaries of Idaho Code section 16-1625. Nonetheless, Mother contends that the lack of appellate review of the shelter care order violates principles of due process by cutting off an independent assessment of the magistrate court's findings and conclusions. Mother also contends that Idaho Code section 16-1625(1) violates principles of equal protection by allowing permissive appeals of any order subsequent to the adjudicatory decree while barring permissive appeals of shelter care orders coming *before* it.

Mother's due process argument is unavailing. The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This guarantee "secures both substantive and procedural due process rights." *Int'l Rescue Comm., v. Mohammed (In re: Wylie St. Emergency Fund)*, 172 Idaho 789, 537 P.3d 30, 42 (2023) (quoting *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 70, 28 P.3d 1006, 1013 (2001)). The substantive component "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Carver v. Hornish*, 171 Idaho 118, 123, 518 P.3d 1175, 1180 (2022) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

The procedural component, on the other hand, "requires that there be some process to ensure that an individual is not arbitrarily deprived of his rights in violation of the state or federal constitutions." *S. Valley Ground Water Dist. v. Idaho Dep't of Water Res*., ___ Idaho ___, ___, 548 P.3d 734, 766 (2024) (citing *Union Bank, N.A. v. JV LLC*, 163 Idaho 306, 317, 413 P.3d 407, 418 (2017)). "Determining whether an individual's due process rights have been violated requires this Court to engage in a two-step analysis." *Id*. (citing *Guzman v. Piercy*, 155 Idaho 928, 939, 318 P.3d 918, 929 (2014)). First, "we must decide whether an individual's threatened interest is a liberty or property interest under the Fourteenth Amendment" and second, "we determine[ ] what process is due." *Id*. (alteration in original) (citations omitted).

18

Our analysis of this case begins and ends with the first step. It is axiomatic that the right of parents to make decisions regarding the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment's due process clause. *Carver*, 171 Idaho at 123–24, 518 P.3d at 1180–81 (citations omitted). Yet, the discrete right claimed by Mother is a *procedural* due process right to appellate review of a shelter care order.

For over a century, the United States Supreme Court has reiterated that the availability of appellate review is not a component of due process. *See Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("[T]he Constitution does not require States to provide a system of appellate review at all."); *Halbert v. Michigan*, 545 U.S. 605, 623 (2005) (holding that states may provide for only discretionary appeals even in criminal cases); *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Chaffin v. Stynchcombe*, 412 U.S. 17, 24 n.11 (1973); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) ("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all."); *McKane v. Durston*, 153 U.S. 684, 687 (1894). The United States Supreme Court has also recognized that the Due Process Clause does not guarantee appellate review of decisions terminating parental rights. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 110–11, 120, 124 (1996) (holding that while the Fourteenth Amendment does not guarantee a right to appellate review of a termination of parental rights decision, once a state affords that right, it may not effectively deny review to indigent parents by conditioning appeals on their ability to pay record preparation fees). Thus, if there is no due process right to appeal decisions terminating parental rights, there is certainly no due process right to appeal a shelter care order that temporarily deprives a parent of physical custody.

Mother's equal protection argument is also unavailing. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Jane Doe I v. John Doe II (2022-06) (In re Doe)*,, 170 Idaho 901, 906–07, 517 P.3d 830, 835–36 (2022) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "However, the Equal Protection Clause does not require 'things which are different in fact . . . to be treated in law as though they were the same[.]' " *Id*. (alterations in original) (quoting *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981)). "This Court's equal protection analysis involves three steps: (1) identifying the classification under attack; (2) identifying the level of scrutiny under which the classification will be examined; and

19

(3) determining whether the applicable standard has been satisfied." *BABE VOTE v. McGrane*, 173 Idaho 609, ___, 546 P.3d 694, 714 (2024) (quoting *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 439, 522 P.3d 1132, 1197 (2023)).

"For equal protection challenges to statutes under the United States Constitution, three levels of scrutiny are used. These are strict scrutiny, intermediate scrutiny, and rational basis." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 395, 987 P.2d 300, 307 (1999) (citation omitted). "This Court employs similar levels of scrutiny when analyzing equal protection challenges under the Idaho Constitution; however, intermediate scrutiny is replaced by the means-focus test." *Nelson v. City of Pocatello*, 170 Idaho 160, 167, 508 P.3d 1234, 1241 (2022). Accordingly, we apply the following tests when addressing the constitutionality of a statute under the Idaho Constitution:

> Where the classification is based on a suspect classification or involves a fundamental right we have employed the "strict scrutiny" test. Where "the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute," the "means-focus" test is applicable. In other cases the "rational basis" test is employed.

*Id.* (quoting *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 710, 791 P.2d 1285, 1289 (1990)).

Here, Mother contends that Idaho Code section 16-1625(1) violates the Equal Protection Clause by allowing appeals of orders entered subsequent to an adjudicatory decree vesting legal custody of a child in IDHW but not allowing appeals of shelter care orders. For this proposition, Mother cites to *M. L. B. v. S. L. J.*, which held that, when the state grants a right to appeal, "these avenues must be kept free of un-reasoned distinctions that can only impede open and equal access to the courts[,]" 519 U.S at 11 (citation omitted). By excluding challenges to shelter care orders, she argues that section 16-1625 "capriciously or arbitrarily denied to parents who may be injured from the moment the State takes action to interfere with their parental rights" and "places parents who have had children removed from their care in a different class."

We are not persuaded by Mother's claim that section 16-1625 creates two different classes of parents. Mother's attempt to distinguish parents who "may be injured from the moment the State takes action to interfere with their parental rights" suggests that other parents would not also be similarly injured by an adjudicatory decree. However, the State's removal of a child from his parents constitutes an interference with the same liberty interest in the care, custody and control of their children. Furthermore, this case does not present a situation where the right to appeal was

20

granted to some parents but arbitrarily denied to others. Instead, any parent involved in a CPA proceeding is granted the same statutory right to appeal from an adjudicatory decree or any other subsequent order that vests legal custody of the child in IDHW. I.C. § 16-1625(1)(a)–(b). Thus, a parent's ability to appeal a decision under section 16-1625(1) is only affected by the stage of a CPA proceeding, not by any class-based distinction. Because Mother has failed to establish that section 16-1625 creates any class-based distinction, we reject her equal protection argument. For the foregoing reasons, we decline to consider Parents' challenge to the magistrate court's shelter care order.

## C. The magistrate court did not err in vesting legal custody of the children in IDHW at Adjudicatory Disposition.

Parents challenge the magistrate court's adjudicatory decree on multiple bases. First, Parents contend that the magistrate court erred in allowing the children to remain in the courtroom and in treating them like parties to the case. Second, Parents contend that the magistrate court's decision to vest legal custody with IDHW was not supported by substantial and competent evidence. Third, Parents contend that the magistrate court violated their fundamental and constitutional rights to parent, pursuant to Idaho Code section 32-1011, by vesting legal custody of the children in IDHW. Each argument is addressed in turn.

### 1. The magistrate court did not err by allowing the Children to remain in the courtroom during the adjudicatory hearing or treating them as parties to the case.

Prior to hearing testimony at the adjudicatory hearing, the magistrate court excluded the youngest children, Child IV and Child V, at the request of the parties. However, the magistrate court declined to exclude the older children, Child I, Child II, and Child III. Following testimony from Parents and Child I, the magistrate court opted to take statements from the remaining older children, Child II, Child III, and Child IV, in chambers outside the presence of the parties, but on the record to determine the Children's placement.

On appeal, Parents challenge the magistrate court's decision to allow the older three children to remain in the courtroom during testimony on two bases. First, Parents argue that the testimony, specifically Child I's testimony, potentially tainted Child II and Child III's recollection and statements to the magistrate court. In support of this contention, Mother directs the Court to several "un-childlike" statements made by Child III and Child IV during their meeting with the magistrate court, such as Child III's request that Parents "prove" that Parents "actually improved" and "do parenting classes" as a condition of returning home and Child IV's similar request for

Parents to take "anger classes and therapy and parenting classes" in order for her to feel safe returning home. Second, Parents argue that allowing the older three children to remain in the courtroom caused undue trauma. Specifically, Father contends that the magistrate court "caused inestimable harm to the children and to their relationship with their parents" by permitting them to hear Parents disparage them. Parents also contend that the magistrate court erred by treating the Children as parties to the CPA proceedings.

Generally, only individuals with a "direct interest in the case" shall be admitted to CPA proceedings. I.C. § 16-1613(1). However, a "child may be excluded from hearings at any time at the discretion of the court." I.C. § 16-1613(1). "We review the discretionary decisions of a trial court for abuse of discretion." *In re Doe (2017-16)*, 163 Idaho 565, 567, 416 P.3d 937, 939 (2018). When reviewing a discretionary decision, we must determine "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Here, we note that Parents' briefing failed to provide any argument concerning which prong of the abuse of discretion standard the magistrate court ostensibly violated when it denied their request to exclude the oldest three children, nor have Parents acknowledged that the decision was one of discretion. Our case law makes it clear that Parents' failure to provide any analysis under the abuse of discretion standard is fatal to their appeal:

> This Court has repeatedly explained that "[f]ailing to demonstrate that an abuse of discretion occurred under any part of the test applied by this Court . . . is fatal to [an] argument that the court abused its discretion." *Valiant Idaho, LLC v. VP Inc.*, 164 Idaho 314, 332, 429 P.3d 855, 873 (2018) (internal quotation and citation omitted). And though this Court does not impose a "formalistic requirement that the standard of review be recited and the party claiming error attack a particular prong of that standard of review," the failure to articulate the abuse of discretion prong challenged and put forth an argument under that prong is fatal. *State v. Diaz*, 170 Idaho 79, 92, 507 P.3d 1109, 1122 (2022).

*Midtown Ventures, LLC v. Capone*, 173 Idaho 172, 180, 539 P.3d 992, 1000 (2023).

Looking beyond the parents' failure to address the proper standard of review, after reviewing the record, we conclude that the magistrate court acted within its discretion. The magistrate court explicitly recognized its discretion to exclude the Children under Idaho Code

22

section 16-1613(1) and acted within the outer boundaries of its discretion by excluding the two younger children while permitting the older children to remain in the hearing.

The magistrate court also acted consistently with the applicable legal standards and reached its decision through the exercise of reason. "[I]n any court decision affecting children, the best interests of the child should be the primary consideration." *Idaho Dep't of Health & Welfare v. Doe (2023-25)*, 173 Idaho 32, ___, 538 P.3d 805, 817 (2023) (alteration in original) (first quoting *Roberts v. Roberts*, 138 Idaho 401, 403–04, 64 P.3d 327, 329–30 (2003); then citing I.C. § 16-1601)). Here, the magistrate court acknowledged the potentially harmful effects of the testimony on the Children and stated that the Parents' concerns were "well-taken." However, the magistrate court also recognized the significance of the CPA proceedings on the Children's lives and the importance of the Children participating in and understanding the proceedings:

> So there are certain considerations that I have to take into account regarding the harmful effects it might have on kids, but we also, through various trainings with the Department of Health and Welfare, through the Supreme Court, through the child protection committee are often and repeatedly told and admonished when we're dealing with kids and their lives and what's going to happen to them, it's also important for them to be able to participate in that and understand what's happening to them and be able to engage in the process. And oftentimes they should be present in child protection cases so that they can hear the outcome from a judge like me rather than from other people telling them what's going to happen to them and make sure that their voice was heard and that they had an opportunity to speak.

Ultimately, after balancing competing concerns, the magistrate court determined that the two younger children should be excluded from the hearing but permitted the older children to remain if they so wished. This bifurcated approach was well reasoned and promoted the best interests of each child by (1) sparing the more vulnerable, younger children from the potentially harmful effect of the testimony, and (2) allowing the less vulnerable, older children to participate in the CPA proceedings. Therefore, we conclude that the magistrate court did not err by permitting the older three children to remain in the courtroom during the adjudicatory hearing.

Turning to their next argument, Parents contend that the magistrate court erred by treating the Children as parties to the CPA proceedings. While they acknowledge that the Children "have a right to be present and to be heard at CPA hearings," Parents argue that the Children "do not possess the rights of parties, and their rights must always be weighed carefully, considering what is in their best interests, as the overarching concern." Rather, children "are the subjects of the CPA case, like they are the subjects of a guardianship or a mother and father's custody case."

23

Initially, we note that the CPA does not specifically refer to the child as a party in a child protective hearing. However, Idaho Code section 16-1614 grants special rights to a protected child, ensuring the child's voice is heard, through the appointment of a guardian ad litem, and through the appointment of counsel:

> (1) In any proceeding under this chapter for a child under the age of twelve (12) years, the court shall appoint a guardian ad litem for the child or children and shall appoint counsel to represent the guardian ad litem, unless the guardian ad litem is already represented by counsel. If a court does not have available to it a guardian ad litem program or a sufficient number of guardians ad litem, the court shall appoint counsel for the child. In appropriate cases, the court may appoint a guardian ad litem for the child and counsel to represent the guardian ad litem and may, in addition, appoint counsel to represent the child.
>
> (2) In any proceeding under this chapter for a child twelve (12) years of age or older, the court:
>
> > (a) Shall appoint counsel to represent the child and may, in addition, appoint a guardian ad litem; or
> >
> > (b) Where appointment of counsel is not practicable or not appropriate, may appoint a guardian ad litem for the child and shall appoint counsel to represent the guardian ad litem, unless the guardian ad litem is already represented by counsel.

I.C. § 16-1614. The guardian ad litem represents the child's best interests, and, through the guardian's own attorney, is permitted to participate in all adjudicatory proceedings to the same degree as a party in the case, including, by way of example, the filing of pleadings, motions, memoranda, and briefs on behalf of the child. I.C. §§ 16-1633, 16-1634(1). In addition, under Idaho Code section 16-1634(1), the guardian ad litem "shall have all of the rights of a party whether conferred by statute, rule of court or otherwise." The guardian ad litem serves as a proxy for a child under the age of 12, and, it stands to reason that if a guardian ad litem is considered a party in a child protection hearing, then it follows that the child himself whom the guardian ad litem represents, and certainly a child over the age of 12 (who does not have a guardian ad litem) is also a party to the child protection hearing. However, for the reasons set forth below, we need not resolve this matter here.

Rule 29 of the Idaho Juvenile Rules states that "[t]he Idaho Rules of Civil Procedure shall apply to C.P.A. proceedings to the extent that they are not inconsistent with these rules, statutes, or the law." I.J.R. 29. Idaho Rule of Civil Procedure 61 provides that, "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial

24

rights." I.R.C.P. 61. "Consequently, because an appellant can only prevail if the claimed error affected a substantial right, the appellant must present some argument that a substantial right was implicated." *In re Doe (2017-16)*, 163 Idaho at 571, 416 P.3d at 943 (quoting *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012)).

Here, Parents have not demonstrated that the magistrate court's conferral of party status to the Children affected any substantial right. Father's opening brief does not present an argument that this alleged error implicated a substantial right of his, or that it had any discernible impact on the proceedings at all. At most, Mother argued that this alleged error may have caused Child III and Child IV's statements to the magistrate court to be tainted by allowing them to hear Parents' and Child I's testimony. Yet, as discussed above, Child IV was excluded from the hearing and the magistrate court's decision to permit the older children to remain in the hearing was predicated on Idaho Code section 16-1613(1). It was not, however, based on the Children's status as parties. Furthermore, the only instance in which the Children's party status appeared to have any influence on the CPA proceeding occurred during Mother's cross examination, when her counsel raised the Children's party status as a defense to a hearsay objection:

| [Mother's counsel:] | Can you describe that and when that happened approximately. |
|---|---|
| [Mother:] | I believe it was on November [sic] when I was in the hospital, and I called my husband and I told him like, "Hey, I'm ready to be discharge [sic]. Can you pick me up?" |
| | And he said, "I can't because [Child I] crashed the car." |
| | So I was like, "What do you mean she crashed the car?" |
| | "She took the car and" – |
| [State's counsel:] | Your Honor, I'm going to object as this is all hearsay. |
| [Mother's counsel:] | I believe it's an exception to the hearsay rule. The father is a party to the case and Ms. Hopkin made the argument the children are parties to the case, so statements of a party opponent are exceptions to the hearsay rule. |
| . . . | |
| [The court:] | Okay. I'm going to overrule the objection. I think the exception is that if it's a statement of a party opponent. I don't know if they're opponents or not, but they may be adverse at times. So I will overrule it on the grounds of statement of party opponent and allow her to answer the question. |

25

For these reasons, we affirm the magistrate court's decision permitting Child I, Child II, and Child III to remain in the courtroom during the adjudicatory hearing. We also decline to consider whether the magistrate court erred by conferring party status to the Children because Parents failed to demonstrate that this decision implicated a substantial right.

2. *Substantial and competent evidence supports the magistrate court's finding that it was contrary to the welfare of the Children to be in their home with their Parents.*

At the conclusion of the adjudicatory hearing, the magistrate court determined that "it would be contrary to the welfare of the children to be returned home at this time and it's in their best interest to remain in the legal custody of the [IDHW] pending some further work in the case[.]" On appeal, Parents challenge the magistrate court's determination concerning the Children's welfare and best interests, arguing that it was unsupported by competent and substantial evidence. In response, IDHW and the Children contend that the magistrate court's decision was supported by competent and substantial evidence and that Parents are merely inviting this Court to reweigh the evidence presented to the magistrate court. We agree with IDHW and the Children.

There are two issues that must be decided at a CPA adjudicatory hearing. First, "the magistrate court must determine, by a preponderance of the evidence, whether the child comes within the court's jurisdiction under the Child Protective Act." *Idaho Dep't of Health & Welfare v. Doe (2023-24)*, 172 Idaho 891, ___, 537 P.3d 1252, 1262 (2023) (citing I.C. § 16-1619(4)). Second, "[i]f the magistrate court determines that it has jurisdiction over the child, it can either place the child under protective supervision of the Department (which means the child can remain in the home subject to Department oversight) or "vest" legal custody of the child in the Department or another authorized agency." *Idaho Dep't of Health & Welfare v. Jane Doe (2022-36)*, 171 Idaho 692, 695–96, 525 P.3d 730, 733–34 (2023) (citing I.C. § 16-1619(5)). In making the custody decision, "the court shall consider any information relevant to the disposition of the child." I.C. § 16–1619(5).

In this case, Parents stipulated to an unstable housing environment as the basis for CPA jurisdiction during the adjudicatory hearing. Therefore, the only issue before the Court is whether the magistrate court erred by vesting legal custody of the Children in IDHW.

Magistrate courts are afforded broad discretion in child custody determinations:

> This Court does not reweigh evidence, but defers to the trial court's unique ability to accurately weigh the evidence and judge the demeanor of the witnesses and take into account the trial court's superior view of the entire

26

> situation. Findings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence.

*Idaho Dep't of Health & Welfare (2021-14)*, 169 Idaho 328, 341–42, 495 P.3d 1016, 1029–30 (2021) (cleaned up).

Here, the magistrate court identified the following facts, among others, to support its conclusion that it would be contrary to the Children's welfare to remain in Parents' home: (1) the four oldest children had each testified to having been subjected to instances of physical violence against themselves as well as against their siblings throughout their lifetimes; (2) these instances of violence included striking the Children with hands or objects in such a manner as to leave marks and bruises; (3) the four oldest children represented to the magistrate court that they were fearful of returning home; (4) Parents denied the regular use of physical discipline when they testified, but routinely stated they did not recall details relative to their discipline of the children; and (5) the magistrate court "personally observed during Father's testimony, that he had difficulty controlling his emotions." The magistrate court further found the statements of the Children "credible as to the extent of violence in the home toward these children." "Based on these facts," the magistrate court further concluded that "it would be difficult for the [IDHW] to prevent the need for removal of the Children, without first providing services to the parents to assist them in identifying alternative means of disciplining their children."

Father contends that "[t]here is simply nothing in the record that leads to the conclusion that the children would be 'unsafe' or 'at risk' if left in the home under protective supervision . . . ." While Father acknowledges that "[a]ll of the children relate that, at some point in the past, corporal punishment, typically spanking with a belt, was used by dad as a disciplinary measure," he alleges that "all testimony suggest[s] that over the last two years, while residing in Idaho that only happened one time, sometime last year perhaps, as a group project for a group discipline situation." Father further alleges that it was "clear both from the testimony of the parents and from the testimony provided by all of the children that corporal punishment had become a thing of the past[;] [m]ost of the testimony verified that discipline with a belt had last occurred on an occasional basis while the family resided" outside of Idaho.

Father's description of the Children's testimony is belied by the record. While Parents testified that they no longer used belts to discipline the Children while residing in Idaho, each child testified to the magistrate court that they had been disciplined with a belt while residing in Idaho,

with one child relaying that this occurred "often." The magistrate court further found the statements of the Children "credible as to the extent of violence in the home toward these children."

Mother acknowledges that the magistrate court "had heard ample testimony . . . about discord, chaos and anger in the home," but "dispute[s] the finding and belief that their home is or was not a safe place" for the Children to return. Mother contends that the magistrate court incorrectly determined that Father's difficulty controlling his emotions was a negative factor in determining the Children's placement because "a review of the testimony shows that each of Father's emotional breakdowns were of sorrow, not anger." Mother further alleges that the magistrate court "accepted at face value that the children were more comfortable in the foster home, and that they may not feel safe returning to parents [sic] home[;]" and that "[t]his reasoning was not supported by substantial and credible evidence."

However, whether Parents believe that the Children should have remained in protective custody or returned home "is not the pertinent question." *Idaho Dep't of Health & Welfare v. Doe (2023-25)*, 173 Idaho 32, ___, 538 P.3d 805, 813 (2023). Instead, "[o]ur sole focus in this appeal is whether there was substantial and competent evidence that 'a reasonable mind might accept as adequate' to support the magistrate court's decision to vest legal custody with the Department." *Id*. In this case, each of the four oldest children detailed concerning instances of physical violence at the hands of Mother and Father, who both stipulated to an unstable housing environment as the basis for CPA jurisdiction during the adjudicatory hearing. Rather than returning the Children to Parents' unstable housing environment, the magistrate court determined that it was in the Children's best interests to remain in the legal custody of the IDHW until Parents engaged with services to "assist them in identifying alternative means of disciplining their children." This finding is supported by substantial and competent evidence. The magistrate court heard testimony from the four oldest children regarding multiple instances of violence that left them bruised—some of which was corroborated by photographic evidence—and indications that the use of physical discipline was increasing in frequency. Again, as Mother recognized, the magistrate court "had heard *ample* testimony . . . about discord, chaos and anger in the home" during the adjudicatory hearing. (Emphasis added.)

Furthermore, the magistrate court was in the unique position to weigh the testimony and evidence and judge the demeanor of the witnesses. *John Doe (2021-14)*, 169 Idaho at 341–42, 495 P.3d at 1029–30. Thus, it was in the province of the magistrate court, as the fact finder, to make

determinations regarding Father's ability to control his emotions and the Children's apprehension for returning to Parents' home. We will not disturb those findings on appeal—made by the judge while observing the witnesses in person— by reweighing the evidence presented to the magistrate court based on a cold record.

For these reasons, we conclude that substantial and competent evidence supports the magistrate court's finding that it was contrary to the welfare of the Children to be in their home with their Parents and it was in their best interests to remain in the legal custody of IDHW.

> 3. *We will not consider Parents' argument that the magistrate court violated the Parental Rights Act because it was raised for the first time on appeal.*

Finally, Parents contend that the magistrate court erred by failing to accord their fundamental parental rights "the deference called for in the Idaho Parental Rights Act." As a subsidiary of this argument, Father also contends that the magistrate court erred by failing to inquire into whether the hanger incident giving rise to the safety concerns was related to Parents' cultural or religious practices or beliefs.

> Judges should inquire whether the incident(s) causing the harm or safety concerns were related to the parent engaging in a cultural or religious practice or belief. The court must carefully consider whether these customs rise to the level of child abuse or neglect. If the judge finds that cultural or community practices and beliefs contributed to the allegations, there should be an exploration of the risk of harm to the child if the practice was to continue in the home. If the judge does believe there is a safety threat to the child, then further action could be taken.

"Idaho Code sections 32-1010–[10]14 make up the Idaho Parental Rights Act (the Act)." *Nelson v. Evans*, 170 Idaho 887, 895, 517 P.3d 816, 824 (2022). "The Act sets forth a parent's fundamental right in the care, custody, and control of his or her children." *Id.* (quoting I.C. § 32-1010(2)–(5)). The Act simply proclaims: "Parents who have legal custody of any minor child or children have the fundamental right to make decisions concerning their care, custody and control." The Act also provides parents with a claim or defense when rights protected by the Act are violated:

> When a parent's fundamental rights protected by this act are violated, a parent may assert that violation as a claim or defense in a judicial proceeding and may obtain appropriate relief against the governmental entity.

I.C. § 32-1013(4). Parents contend the appropriate relief for a violation of their fundamental right to discipline their children is to "void" all actions taken by IDHW and the magistrate court. We disagree with Parents' position.

29

To begin with, Father cite no legal authority for his assertion that the magistrate court and IDHW had an independent obligation to inquire as to whether Parents' discipline of their children was based on their religious beliefs. We will not consider arguments that are not supported by legal authority. *Idaho Dep't of Health & Welfare v. Doe*, 158 Idaho 764, 769, 351 P.3d 1222, 1227 (2015). Similarly, Parents never raised the application of the Idaho Parental Rights Act at any time during the proceedings before the magistrate court. We have repeatedly admonished litigants that the failure to raise an issue with the trial court results in a forfeiture on appeal. *Hall v. State*, 172 Idaho 334, ___, 533 P.3d 243, 261 (2023). This general rule applies even if the question is of constitutional dimension. *See State v. Heath*, 168 Idaho 678, 685, 485 P.3d 1121, 1128 (2021) (holding that a defendant waived his argument that Idaho's prohibition of marijuana use violated the Free Exercise of Religion Protected Act because the issue was first raised on appeal). Therefore, we will not consider Parents' argument.

## IV.  CONCLUSION

For these reasons, we affirm the adjudicatory decree entered by the magistrate court.

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.